Charles A. Henty, OSB #196001
Forsberg & Umlauf, P.S.
401 Union St., Suite 1400
Seattle, WA 98101
Phone: (206) 689-8500
chenty@foum.law
*Attorneys for Plaintiff General
Insurance Company of America*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON
PORTLAND DIVISION

| | |
|---|---|
| GENERAL INSURANCE COMPANY OF AMERICA, a foreign insurance company doing business in the State of Oregon,<br><br>Plaintiff,<br><br>vs.<br><br>PENCO, INC, a dissolved Oregon corporation, and PENINSULA IRON WORKS, an Oregon business entity,<br><br>Defendants. | No. 3:25-cv-01335-SB<br><br>**PLAINTIFF GENERAL INSURANCE COMPANY OF AMERICA'S MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>**REQUEST FOR ORAL ARGUMENT** |

## TABLE OF CONTENTS

I.   MOTION.................................................................................................................. 4
II.   STATEMENT OF FACTS ........................................................................................ 4
   A.   Background.......................................................................................................... 4
   B.   PENCO's Tender to General and General's Payments........................................ 9
   C.   The Policy ............................................................................................................ 9
III.   ARGUMENT............................................................................................................ 11
   A.   The Legal Standard Applicable to this Motion.................................................... 11
   B.   PENCO has not Asserted Affirmative Defenses that Preclude the Relief Sought by this Motion.................................................................................................................... 11
   C.   Documents the Court Should Consider When Ruling on this Motion.............................. 12
   D.   All Costs Incurred by PENCO Under the Order are Presumptive Indemnity Costs Under ORS 465.480 and Erode the Policy's Limits of Liability.......................................... 14
      1.   General's Duty to Defend and Duty to Indemnify Under the Policy ........................... 14
      2.   Environmental Cost Characterization Under the Oregon Environmental Cleanup Assistance Act.......................................................................................................... 15

4915-1409-7790, v. 1

3.      General Paid More Than its Aggregate Limit of Liability for Costs Properly Characterized as Indemnity Under the OECAA .................................................................. 18

4.      PENCO's Counterclaim Allegations do not Create a Question of Fact ........................ 23

E.    Because the Order is the Functional Equivalent of a Judgment or Settlement, General's Payment of its Aggregate Limits of Liability Extinguishes its Duty to Defend ........................ 23

F.    PENCO's Counterclaims Are Properly Resolved by This Motion .................................. 26

IV.    CONCLUSION .................................................................................................................... 27

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 2

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET ● SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 ● (206) 689-8501 FAX

4915-1409-7790, v. 1

# TABLE OF AUTHORITIES

**Cases**

*Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004) .................................... 12, 24

*County of Santa Clara v. United States Fidelity & Guaranty Co.*, 868 F.Supp. 274, 277 (N.D. Cal. 1994) ............................................................................................................................. 25

*Dye v. Hofbauer*, 546 US 1, 126 S. Ct. 5, L.Ed. 2d 1 (2005) ......................................................... 13

*Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009) ............................................................... 12

*Gen Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congressional Church*, 887 F.2d 228, 230 (9th Cir. 1989) .............................................................................................. 12

*Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) ................................. 14

*Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) ........................ 12

*Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3rd Cir. 1989) .................................................................. 13

*Ross v. Williams*, 950 F.3d 1160, 1169 (9th Cir. 2020) ............................................................... 13

*Siltonic Corp. v. Emplrs Ins. Co. of Wausau*, 176 F.Supp.3d 1033 (D. Or. 2016) ................ passim

*St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 126 Or.App. 689, 702, 870 P.2d 260 (1994) ................................................................................................................... 23

*Unite Here Loc. 30 v. Syucan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022) 12

*Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 692, 15 P.3d 115 (2001) ... 25, 26

**Statutes**

OAR 340-122-0072(3) ................................................................................................................... 17

OAR 340-122-0080 ....................................................................................................................... 17

OAR 340-122-0080(1) ................................................................................................................... 17

OAR 340-122-0085 ....................................................................................................................... 17

OAR 340-122-0115(45) ........................................................................................................... 18, 21

OAR 340-122-0115(49) ................................................................................................................. 17

OAR 340-122-072 ......................................................................................................................... 17

OAR 340-122-085(1) ..................................................................................................................... 18

OAR-122-0115 .............................................................................................................................. 18

OAR-122-0115(45) ........................................................................................................................ 19

ORS 465.200 .................................................................................................................................. 18

ORS 465.200(15)(a) ....................................................................................................................... 18

ORS 465.200(17) ........................................................................................................................... 18

ORS 465.200(22) ........................................................................................................................... 18

ORS 465.200(24) ........................................................................................................................... 18

ORS 465.480 .................................................................................................................................. 15

ORS 465.480(7) ........................................................................................................................ 16, 21

ORS 465.480(7)(a) .................................................................................................................... 16, 19

ORS 465.480(7)(b) .................................................................................................................... 17, 23

ORS 465.484 .................................................................................................................................. 28

ORS 742.061 .................................................................................................................................. 27

**Rules**

Fed. R. Civ. P. 12(c) ...................................................................................................................... 12

Rule 10(c) ...................................................................................................................................... 13

Rule 12(c) ...................................................................................................................................... 12

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 3

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

As required by LR 7-1, counsel for the parties have conferred regarding the subject matter of this motion and are unable to resolve the dispute the motion presents to the Court.

## I.    MOTION

This lawsuit presents three threshold legal questions for resolution by the Court: (1) whether certain environmental response costs General Insurance Company of American ("General") has reimbursed its insured, PENCO, Inc. ("PENCO") are properly characterized as defense costs (payable in addition to limits of liability) or indemnity costs (payable within limits of liability); (2) whether General has exhausted the aggregate limits of the policy it issued to PENCO; and (3) whether the exhaustion of the policy extinguishes any further obligations General may otherwise have to PENCO for claims subject to those aggregate limits.[1]  The answers these questions are established by the written documents attached to General's Complaint and incorporated by reference in PENCO's counterclaims.  As outlined below, the answer to each of these questions is "yes."  Accordingly, by this motion, General respectfully requests that the Court enter judgment on the pleadings in its favor pursuant to FRCP 12(c).

## II.    STATEMENT OF FACTS

### A.    Background

PENCO owned and operated an industrial machine and fabrication shop located at 6618 North Alta Avenue in Portland (the "Property").  The machine and fabrication shop was adjacent to Cathedral Park, bordered by North Bradford Street and a railroad right of way to the southwest, North Alta Avenue to the northwest, North Crawford Street to the northeast, and a Cathedral Park

---

[1]PENCO raises additional legal questions in its counterclaim, which as discussed below, are moot if the Court answers the two questions raised by this motion in favor of General.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 4

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

parking lot to the southeast. Compl., Ex. A at 3. The machine and fabrication shop began operating in the early 1900s and remains active to this day. *Id.* Polychlorinated biphenyls are often associated with historical operations at machine and fabrication shops. *Id.*

In February 2022, PENCO voluntarily entered into a letter agreement with the Oregon Department of Environmental Quality ("DEQ") to investigate hazardous substances located on and adjacent to the Property. *Id.* at 4. In March 2023, PENCO provided DEQ a draft report documenting results of a focused site investigation performed between November 2022 and January 2023. This sampling identified high concentrations of PCBs in surface and subsurface soils. PCBs were detected in 73 of the 142 soil samples. *Id.* at 3. In addition, investigations performed by other parties documented the presence of PCBs in soil adjacent to the Property, including in Cathedral Park. *Id.* at 4.

In May 2023, DEQ and PENCO agreed to the issuance by DEQ of an Order on Consent for Removal Action (the "Removal Action Order"). *Id.* at 18. As part of the Removal Action Order, DEQ made the following findings of fact:

> …
>
> E.    PCBs are present at high concentrations in surface and subsurface soil on and adjacent to [the Property]. The PCB impacted soil presents a complete exposure pathway to [PENCO] employees who work near the metal shavings and waste storage containers; [PENCO] employees and community members who walk along or cross the railroad tracks; and community members who use Cathedral Park. Bare soil contaminated with PCBs on and adjacent to [the Property] may be migrating offsite through stormwater transport.
>
> …
>
> H.    A soil excavation and/or capping is urgently needed to reduce exposure of site workers and community members to

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 5

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

high concentrations of PCB impacted soils on and adjacent to [the Property], and to minimize the offsite transport of PCBs in stormwater.  Additional soil sampling is urgently needed in Cathedral Park to determine if additional areas of the park are contaminated with high concentrations of PCBs.

*Id.* at 3-4.

The Removal Action Order required PENCO to perform the following work:

> 5.    Work to be Performed
>
> A.    Timely and Temporary Cover of Bare PCB Impacted Soil
>
> Respondent shall place and maintain a temporary cover on bare surface soils impacted by PCBs on and adjacent to [the Property] to protect public health, safety, and welfare and the environment.  The PCB impacted soils will be further addressed in Subsection B and a DEQ approved work plan.  This work is on-going and began under the voluntary cleanup letter agreement.
>
> B.    PCB Impacted Soil Removal Action
>
> Respondent shall excavate and/or cap PCB impacted soil on and adjacent to [the Property] in accordance with OAR Chapter 340 Division 122, the terms and schedule set forth in the Scope of Work (SOW) contained in Exhibit B to this [Removal Action Order], and the terms and schedules set forth in any DEQ-approved work plan.  Once approved by DEQ, a work plan is deemed to be incorporated into and made a fully enforceable part of this [Removal Action Order].

*Id.* at 5.

The work required by the Removal Action Order is described in greater detail in a Scope of Work ("SOW") attached to the Removal Action Order.  The SOW reiterated DEQ's two objectives: placement of a timely and temporary cover over PCB impacted soil and performance

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 6

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

of timely soil excavation and/or capping of PCB impacted soil where highly contaminated surface soil is accessible to the public. *Id*. at 20. With respect to the second objective, the SOW identified specific areas of PCB impacted soil, which it described as the "minimum action areas" in which soil excavation or capping would be necessary. *Id.* at 21, 23. These areas included portions of Cathedral Park designated as "DU10" and "DU10-Plus." *Id.* at 23.

PENCO alleges that DEQ approved a Focused Remedial Action Work Plan (the "Work Plan") that required PENCO to conduct soil sampling in Cathedral Park "to provide a better understanding of the distribution of PCB-impacted soils." Countercl. at ¶48. PENCO alleges that this soil sampling is required by the Removal Action Order and that once that sampling was completed, the Order required that "a supplement to this Work Plan will be prepared that describes potential soil removal and/or capping actions for these areas." *Id*. The text of PENCO's allegations does not identify the specific areas within Cathedral Park with respect to which this sampling was required, but the Work Plan itself does. The areas were DU10 and DU10-Plus. The Work Plan states:

> Maul Foster Alongi, investigating on behalf of ODEQ, reported (June 24, 2022) for DU10 a total PCB concentration of 3.45 mg/Kg obtained from one incremental Sampling Methodology ("ISM["]) sample consisting of 50 soil aliquots obtained on a grid pattern across the decision unit at a depth of two (2) inches below surface grade (following removal of wood chips). ENW requested of ODEQ, and obtained, permission to submit the Removal Action Work Plan for DU10 in stages; submission of Work Plan to conduct further soil sampling and analysis within the area of DU10 followed by submission of an Addendum/Supplement to the Work Plan that presents sampling results and proposed soil excavation and/or capping actions for DU10 intended to mitigate any imminent threats to human health and safety or to the environment and to protect or reduce any potential for stormwater transport of PCBs.

Work Plan, attached hereto as Appendix A, at 5.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 7

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

PENCO further alleges that the purpose of the sampling required by the Work Plan was to "investigate the magnitude and extent of PCB contamination in Cathedral Park" and that by email dated June 18, 2024, it pressed General "to approve PENCO going forward with the proposed Work Plan, advising that DEQ was threatening PENCO with enforcement proceedings for delays in proceeding with the investigations required by the Order." Countercl. at ¶¶50-51. The letter from DEQ to PENCO, which was attached to the June 18, 2024 email, states:

> According to [the Removal Action Order] executed by Peninsula Iron Works and the Oregon Department of Environmental Quality (DEQ) on May 22, 2023, the excavation and/or capping of soils contaminated with polychlorinated biphenyls (PCBs) schedule was to be included in the work plan. The Focused Removal Action Work Plan (Work Plan) specifies that the sampling of the DU10 and DU10-Plus areas, which would inform the extent of the excavation, would occur within five (5) days of DEQ's approval of the Work Plan. DEQ approved the Work Plan on August 3, 2023. To date, this work has not been completed.

June 18, 2024 email (with attachment), attached hereto as Appendix B, at 3.

Finally, PENCO alleges that the investigative work required by the Removal Action Order that Evren Northwest performed, reflected in a November 25, 2024 Focused Surface Material Investigation Report, "was to investigate the nature and extent of potential PCB contamination and whether any remedial action would be necessary at the Site." Countercl. at ¶53. This report specifically addresses DU10 and DU10-Plus. Focused Surface Material Investigation Report, attached hereto as Appendix C, at 1. The purpose of the investigation was "to provide a better understanding of the lateral and vertical distribution of PCB-impacted soils in Decision Units DU10 and DU10-Plus in Cathedral Park." *Id.* at 7. The investigation confirmed the presence of PCBs in soils at various depths throughout DU10 and DU10-Plus. *Id.* at 16-17, 20-23.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 8

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

**B.      PENCO's Tender to General and General's Payments**

In June 2023, PENCO tendered to General defense and indemnity of its liability for pollution on and adjacent to the Property.  Countercl. at ¶45.  General agreed to defend PENCO under General Policy No. CP383127 (the "Policy") subject to a reservation of its rights.  *See*, Compl., Ex B.  PENCO submitted invoices from its environmental consultant, Evren Northwest, to General for payment.  General reviewed the invoices and characterized the charges on them as either investigation costs payable as part of a duty to defend or remediation costs payable as part of a duty to indemnify.  General characterized a total of $128,088.95 of charges reflected on Evren Northwest invoices dated between June 2023 and February 2025 as remediation costs payable as part of a duty to indemnify.  *Id*., Ex. C at 4-5.  After General issued payment for $75,000 to reimburse PENCO for indemnity costs (in addition to $81,580.11 to reimburse PENCO for defense costs), General notified PENCO that the Policy had exhausted and would provide no further coverage.  *Id*. at 2.

**C.      The Policy**

General issued the Policy to PENCO for a policy period of February 27, 1973 to February 27, 1976.  Compl., Ex. D at 3.  However, the Policy was cancelled effective August 1, 1974.  *Id*. at 2.  The Policy includes the following insuring agreement:

> 1.      COVERAGE A – BODILY INJURY – except Automobile
>
> COVERAGE B – PROPERTY DAMAGE – except Automobile
>
> COVERAGE C –BODILY INJURY – Automobile
>
> COVERAGE D – PROPERTY DAMAGE – Automobile
>
> With respect to such of the foregoing as have become effective under the provisions of the declarations page of this

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 9

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

policy, the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence. The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false, or fraudulent, and may make such investigation or settlement of any claim as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.

The Policy provided a "Divided Limits Plan," meaning it included separate limits of liability for bodily injury and property damage. The "Coverage B" (non-automobile) property damage limit of liability was $25,000 each occurrence and $25,000 aggregate. *Id*. at 4. The Policy includes a Limits of Liability provision stating, in relevant part:

4.    LIMITS OF LIABILITY

…

(b)    Divided Limits Plan

…

COVERAGE B –

The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as the result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence." The total limit of liability of the company for all damages because of all property damage to which this coverage applies shall not exceed the limit of property damage liability stated in the declarations as "aggregate."

…

Aggregate limits of liability as stated in this policy shall apply separately to each annual policy period.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 10

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

*Id.* at 14.

## III.    ARGUMENT

### A.    The Legal Standard Applicable to this Motion

Rule 12(c) provides that "[a]fter the pleadings are closed – but early enough not to delay trial – a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c). In reviewing a 12(c) motion, "[a]ll allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party." *Unite Here Loc. 30 v. Syucan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022) (*quoting Gen Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congressional Church*, 887 F.2d 228, 230 (9th Cir. 1989). The Ninth Circuit has explained that "[a] district court must grant a motion for judgment on the pleadings when there is no issue of material fact, and the moving party is entitled to judgment as a matter of law." *Unite Here*, 35 F.4th at 700 (*citing Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009). The Ninth Circuit has also held that "a plaintiff is not entitled to judgment on the pleadings if the defendant's answer raises issues of fact or affirmative defenses." *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (*citing Gen Conf. Corp.*, 887 F.2d at 230). However, the Court is not required to accept the veracity of "legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged" or "merely conclusory, unwarranted deductions of fact or unreasonable inferences." *Cholla Ready Mix, Inc. v. Civish*, 382 F.3d 969, 973 (9th Cir. 2004).

### B.    PENCO has not Asserted Affirmative Defenses that Preclude the Relief Sought by this Motion

PENCO has asserted two affirmative defenses: (1) failure to exhaust the liability limits of the Policy; and (2) a reservation of the right to assert additional defenses before trial. Answer at

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 11

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

8.  Neither of these defenses precludes the relief sought by this motion.  The first reflects the legal disagreement this motion asks the Court to resolve.  The second is a non-substantive reservation of rights.

## C.     <u>Documents the Court Should Consider When Ruling on this Motion</u>

The exhibits attached to General's Complaint should be considered by the Court when ruling on this motion.  Rule 10(c) provides that "[a] copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes."  The rule does not define the term "written instrument."  The Ninth Circuit has addressed the interpretation of "written instrument" only once, in the context of a habeas corpus petition.  There, the court reviewed *Dye v. Hofbauer*, 546 US 1, 126 S. Ct. 5, L.Ed. 2d 1 (2005) and concluded that "especially in the habeas context… that the term was intended to be limited to private written agreements such as contracts, leases, or wills." *Ross v. Williams*, 950 F.3d 1160, 1169 (9th Cir. 2020).  The court concluded that an order issued by a state's high court must constitute a "written instrument" since the Supreme Court held in *Dye* that a brief appended to a complaint was a "written instrument" for the purpose of Rule 10(c).  *Id*. In so holding, the court noted that "*Dye* treated an appended supporting brief as part of a habeas petition pursuant to Rule 10(c) without making a distinction between habeas petitions and other civil actions for the purposes of incorporation of attachments."  *Id*. (emphasis added).  Consistent with *Dye* and *Ross*, the Third Circuit has explained that "the types of exhibits incorporated within the pleadings by Rule 10(c) consist largely of documentary evidence, specifically contracts, notes, and other writing[s] on which [a party's] action or defense is based." *Rose v. Bartle*, 871 F.2d 331, 339 n.3 (3rd Cir. 1989).

The exhibits attached to General's Complaint are all documentary evidence on which General's action is based – the Removal Action Order (Ex. A), communications sent by General

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 12

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

to PENCO (Ex. B, Ex. C, Ex. F), the Policy (Ex. D), and checks General issued to PENCO (Ex. E) – and are properly treated as part of the complaint when considering this motion.

The appendices to this motion are documents incorporated by reference in PENCO's counterclaims and also should be considered by the Court when ruling on this motion. Incorporation-by-reference is a judicially created doctrine that treats certain documents as though they are part of the complaint itself. The doctrine "prevents plaintiffs from selecting only portions of documents that support their claims, while omitting portions of those very documents that weaken – or doom – their claims." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018). A defendant may seek to incorporate a document into the complaint "if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* The appendices to this motion are documents properly before the Court for the purpose of this motion because they are incorporated by reference in PENCO's counterclaims.

Appendix A is the Work Plan. PENCO's counterclaims describe investigation required by the Work Plan and suggest that costs incurred performing the investigative work are properly characterized as defense costs under Oregon law. Countercl. at 48-51.

Appendix B is a June 18, 2024 email that PENCO's counsel sent to General regarding a letter it received from DEQ regarding work to be performed under the Work Plan and suggesting that the letter from DEQ pertained to work the costs of which would be properly characterized as defense under Oregon law. *Id.* at ¶51. It is therefore appropriate for the Court to consider the DEQ letter itself, which confirms that the costs are properly characterized as indemnity.

Appendix C is the Focused Surface Material Investigation. PENCO's counterclaims include allegations that the work performed by Evren Northwest reflected in this document "was to investigate and delineate the nature and extent of potential PCB-contamination and whether any

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 13

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

remedial action would be required at the Site." *Id.* at ¶53.  PENCO would have the Court infer that costs incurred in the preparation of this report should be treated as defense costs.  It is therefore appropriate for the Court to consider the Focused Surface Material Report itself.

**D.    All Costs Incurred by PENCO Under the Order are Presumptive Indemnity Costs Under ORS 465.480 and Erode the Policy's Limits of Liability**

**1.    General's Duty to Defend and Duty to Indemnify Under the Policy**

The Policy is a standard form primary liability policy imposing two separate duties on General.  First, General has a duty to indemnify, the duty to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of… property damage[.]"  Second, General has a duty to "defend any suit against the insured seeking damages on account of such… property damage, even if any of the allegations of the suit are groundless, false or fraudulent…"  Compl, Ex. D at 12.  Both duties are extinguished once General has paid its applicable limits of liability indemnifying PENCO.  In this regard, the Policy states "[t]he company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of liability has been exhausted by payment of judgments or settlements." *Id.*

The schedule of the Policy states that it provides property damage limits of liability of $25,000 per occurrence and in the aggregate. *Id.* at 4.  The aggregate limit of liability is annualized. *Id*. at 14 (Stating that for a Divided Limits Plan, with respect to property damage, "[a]ggregate limits of liability shall apply separately to each annual policy period.").  The Policy was cancelled during its second annual policy period.  Therefore, the total aggregate limits of the Policy for property damage liability are $50,000.

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

**2.** **Environmental Cost Characterization Under the Oregon Environmental Cleanup Assistance Act**

Standard form general liability policies, such as the Policy, were not written specifically to address an insured's pollution liability. The concept of a "suit," with respect to the duty to defend, is not a perfect fit for a context in which a regulator often compels action by the insured without resorting to formal litigation. Similarly, the concept of a "settlement or judgment" often does not fit neatly into the reality that insureds frequently satisfy their environmental liabilities by performing remediation activities demanded by a regulator. The differences between traditional litigation concepts and the framework of federal and state cleanup laws have historically been the source of disputes between insurers and their insureds regarding insurance coverage for environmental liabilities, including disputes regarding whether environmental response costs should be characterized as defense costs, payable in addition to liability limits as part of a duty to defend, or indemnity costs, payable within liability limits as part of a duty to indemnify. In Oregon, the legislature has sought to minimize such disputes through its adoption of the Oregon Environmental Cleanup Assistance Act ("OECAA"). The OECAA includes a provision, ORS 465.480(7), addressing the characterization of environmental response costs. ORS 465.480(7)(a) establishes that certain categories of environmental response costs are presumptively defense costs. It states:

> (7)(a)  There is a rebuttable presumption that the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation, as those terms are defined by rule by the Department of Environmental Quality, are defense costs payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 15

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

DEQ's definitions of these terms are important to the issues presented by this motion. OAR 340-122-072 addresses preliminary assessments. It states that "[t]he purpose of a preliminary assessment is to develop sufficient information to determine whether additional investigation, removal, remedial action, or long-term engineering or institutional controls related to removal or remedial action are needed at a facility to assure protection of present and future public health, safety and welfare, and the environment." OAR 340-122-0072(3). OAR 340-122-0080 addresses remedial investigations. It states that "[i]f, based upon the Preliminary Assessment, the results of a removal, or other information, the Director determines that remedial action may be necessary, the Director may perform or require to be performed a remedial action to develop information to determine the need for remedial action." OAR 340-122-0080(1). The term "risk assessment" is defined, in relevant part, as "the process used to determine the probability of an adverse effect due to the presence of substances." OAR 340-122-0115(49). Thus, each of the categories of environmental response costs presumed to be defense costs is a step that may be necessary to determine whether corrective action must be performed to address pollution.

ORS 465.480(7)(b) establishes that certain categories of environmental response costs are presumptively indemnity costs. It states:

> (b)     There is a rebuttable presumption that payment of the costs of removal actions or feasibility studies, as those terms are defined by rule by the Department of Environmental Quality, are indemnity costs and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the provisions of the applicable general liability insurance policy or policies.

Again, the definitions of these terms are important. OAR 340-122-0085 addresses feasibility studies. It states that [i]f, based upon the remedial investigation, the results of a removal, or other information, the Director determines that removal action might be necessary to protect

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 16

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

public health, safety or welfare or the environment, the Director may perform or require to be performed a feasibility study to develop information for selection or approval of a remedial action." OAR 340-122-085(1). OAR 340-122-0115(45) states that "'Remedial Action' and 'Removal' have the meanings set forth in ORS 465.200(22) and ORS 465.200(24), respectively, and for purposes of these rules, may include investigations, treatment, excavation and offsite disposal, engineering controls, institutional controls, any combination thereof." ORS 465.200 has been amended, and its subparts renumbered, since OAR-122-0115 was adopted by DEQ. The relevant definitions are now found in subparts (15) and (17). Remedial action is defined, in relevant part, as "those actions consistent with a permanent remedial action taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance, to prevent or minimize the release of a hazardous substance so that it does not migrate to cause substantial danger to present or future public health, safety, welfare or the environment." ORS 465.200(15)(a). Removal is defined, in relevant part, to mean "the cleanup or removal of a released hazardous substance from the environment, such actions as may be necessary to monitor, assess and evaluate the release or threatened release of a hazardous substance, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health, safety, welfare or to the environment, that may otherwise release from a release or threat of release." ORS 465.200(17). Thus, each of the categories of environmental response costs presumed to be indemnity costs is a step that may be necessary, once it has been determined that corrective action is required to address pollution, to develop and implement appropriate corrective action(s).

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 17

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

**3.** **General Paid More Than its Aggregate Limit of Liability for Costs Properly Characterized as Indemnity Under the OECAA**

PENCO does not dispute that General paid $75,000 in costs for work required by the Removal Action Order.  However, PENCO alleges that certain of the costs incurred pursuant to the Removal Action Order are investigation costs.  Countercl. at ¶¶45, 51, 53 (describing investigative work performed "pursuant to the terms of the [Removal Action Order]", "investigations required by the Order," and "soil sampling and investigation work as required by the Order," respectively).  PENCO's position is that these investigation costs are properly characterized as defense costs.  But not all investigative work is presumptively payable as a defense cost under OECAA.  Only costs incurred to perform "preliminary assessments, remedial investigations, risk assessments" are presumed to be defense costs.  ORS 465.480(7)(a).  These are investigative costs that must be incurred to determine *whether* remedial action is necessary.  Under the OECAA, costs incurred to perform removal actions or feasibility studies are presumptive indemnity costs.  Pursuant to OAR-122-0115(45), "remedial action" and "removal" may include "investigations."  These are such investigations as may be necessary *after* it has been determined that remediation is necessary to determine the type or scope of remedial action to be performed.

The investigation costs that would be presumptive defense costs under the OECAA, those investigation costs necessary to determine whether remedial action would be required at the Site, were performed before PENCO and DEQ entered the Removal Action Order.  The Removal Action Order describes those investigations: a focused site investigation by PENCO that detected PCBs in 73 of 142 soil samples and investigations conducted on adjacent properties (including Cathedral Park) by the City of Portland, DEQ, the United States Environmental Protection Agency,

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET ● SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 ● (206) 689-8501 FAX

and Union Pacific Railroad that also detected PCBs in soil samples. Compl., Ex. A at 3-4. Based on these prior investigations DEQ concludes in the Removal Action Order that "PCBs are present in surface and subsurface soil on and adjacent to [the Property]" and that "PCB-impacted soil presents a completed pathway" to PENCO employees working in certain areas and to community members who walk along or cross the railroad tracks or use Cathedral Park. *Id.* at 3. DEQ specifically finds that "soil excavation and/or capping is urgently needed to reduce exposure of site workers and community members to high concentrations of PCB impacted soils on and adjacent to [the Property]". *Id.* at 4. Accordingly, the Removal Action Order requires PENCO "excavate and/or cap PCB impacted soil on and adjacent to [the Property]…" *Id.* at 5.

The Removal Action Order establishes the need for remedial action on the Property and land adjacent to the Property, including Cathedral Park. By PENCO's own admission, the investigation work that it describes in its counterclaim is work required by the Removal Action Order. Countercl. at ¶¶51, 53 (describing "investigations required by the [Removal Action Order]" and stating that Evren Northwest "conducted the necessary soil sampling and other investigation work as required by the [Removal Action Order]…"). Documents that are part of the Complaint and incorporated into PENCO's allegations confirm that investigative work required by the Removal Action Order was conducted to determine the scope of the remedial action to be performed not whether remedial action was necessary. The Work Plan requires sampling in two portions of the park, DU10 and DU10-Plus. Appendix B at 5. The Removal Action Order specifically identified these as areas in which remedial action is necessary. Compl., Ex. A at 21, 23. DEQ's June 18, 2024 letter confirms that the investigation required by the Work Plan is not to determine whether remedial action is necessary. Instead, it states that sampling of the DU10

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 19

FORSBERG & UMLAUF, P.S.
ATTORNEYS AT LAW
401 UNION STREET ● SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 ● (206) 689-8501 FAX

4915-1409-7790, v. 1

and DU10-Plus areas "would inform the *extent* of the excavation" to be performed in those areas. Appendix B at 3 (emphasis added).

The circumstances here are similar to circumstances addressed by the court in *Siltonic Corp. v. Emplrs Ins. Co. of Wausau*, 176 F.Supp.3d 1033 (D. Or. 2016).  The *Siltronic* litigation involved disputes among the insured (Siltronic), its primary insurer (Wausau) and its excess insurer (Granite State).  One of those disputes was the proper characterization as defense or indemnity of certain costs Siltronic incurred performing work required by an Administrative Settlement Agreement and Order on Consent ("ASAOC") entered by Siltronic (along with another party liable for the pollution at issue, NW Natural) and EPA.  *Id.* at 1045.  The ASAOC called for Siltronic to perform "a response action investigation and design activities" for the Gasco Sediments Site.  *Id.*  The SOW describing the work be performed under the ASAOC referred to the project as the "final sediment remedy."  *Id.*  The SOW had three parts: "investigation, Engineering Evaluation/Cost Analysis (EE/CA), and design[.]"  *Id.* at 1046.  The ASAOC referred to the "investigation" it required as a "final remedial investigation."  *Id.*  Granite State argued that the costs for the "final remedial investigation" were "remedial investigation" costs that would be presumptive defense costs under the OECAA.  *Id.*  The court stated:

> Granite State basically argues that all projects that involve investigation are defense costs.  However, only remedial investigations and "other necessary investigations" are presumed to be defense costs.  Although not expressly referenced in ORS 465.480(7), the administrative rules provide that removal and remedial action (indemnity costs) also "may include investigations, treatment, excavation and offsite disposal, engineering controls, institutional controls, any combination thereof."  OAR 340-122-0115(45) (emphasis added).  The question is what types of investigation fall into that latter category.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 20

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET ● SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 ● (206) 689-8501 FAX

4915-1409-7790, v. 1

*Id.* The court rejected Granite State's argument and concluded that the "final remedial investigation" costs were properly characterized as indemnity costs for three reasons, all of which are also applicable here.

*First*, the court distinguished the purpose of the investigation required by the ASAOC from the purpose of a "remedial investigation" as defined by DEQ's regulations (*i.e.*, an investigation to "develop the need for remedial action"). In this regard, the court noted that the investigation required by the ASAOC was intended to "identify the exact location, quantity, or nature of the contamination by performing "further characterization, studies, analysis and preliminary design that will lead to a final remedy…" *Id.* Similarly, the purpose of the investigation required by the Removal Action Order here was to "inform the extent of the [soil] excavation" that would be required for DU10 and DU10-Plus in Cathedral Park. Appendix B at 3.

*Second*, the court noted that the ASAOC and the SOW both referenced "several site investigations revealing that the river sediments were sufficiently contaminated… to require a 'removal response action.'" *Id.* The Removal Action Order likewise describes prior investigations that detected PCBs in soil on the Property and adjacent to the property and concludes that "[a] soil excavation and/or capping is urgently needed to reduce exposure of site workers and community members to high concentrations of PCB impacted soils on and adjacent to [the Property]". Compl., Ex. A at 4. Therefore, in this case as in *Siltronic*, "when the parties entered the [Removal Action Order] it was clear that contaminants in the [Site] required cleanup…" and "additional investigation and data collection… was not necessary to 'develop the need for remedial action.'" *Siltronic*, 176 F.Supp. at 1046.

*Finally*, the court noted that the "preliminary assessment and remedial investigation for the Gasco Sediment Site was being completed outside the SOW." *Id.* at 1047. Again, the

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 21

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

circumstances here are indistinguishable. The investigations necessary to determine whether remedial action was necessary at the Site were performed by PENCO (the focused site investigation) and other parties before PENCO and DEQ entered the Removal Action Order. Compl., Ex. A at 4. These investigations were performed outside of the Removal Action Order. Costs incurred by PENCO performing investigations required by the Removal Action Order, like the final remedial investigation costs at issue in *Siltronic*, are properly characterized as indemnity under the OECAA.

Because costs incurred by PENCO to perform the investigation required by the Removal Action Order are properly characterized as indemnity costs, these costs apply to and erode the Policy's limits of liability. Pursuant to the OECAA, the payment of costs (such as these) that are presumptive indemnity "reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the provisions of the applicable general liability insurance policy or policies." ORS 465.480(7)(b).

This is consistent with the terms of the Policy. The Policy grants coverage for "all sums which the insured shall become legally obligated to pay as damages because of… property damage…" Compl., Ex. D at 12. The undefined term "damages" in a general liability policy includes cleanup costs under Oregon law. *St. Paul Fire & Marine Ins. Co. v. McCormick & Baxter Creosoting Co.*, 126 Or.App. 689, 702, 870 P.2d 260 (1994). The Limits of Liability section of the Policy states that "[t]he total limit of the company for all damages because of all property damage to which this coverage applies shall not exceed the limit of liability stated in the damages as 'aggregate', and that "[a]ggregrate limits of liability as stated in this policy shall apply separately to each annual period." Compl., Ex. D at 14. The declarations state that the aggregate limit for property damage claims is $25,000. *Id.* at 4. The Policy was issued for a policy period of February

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 22

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

27, 1973 to February 23, 1976 but was cancelled effective August 1, 1974. *Id*. at 2-3. Therefore, the aggregate limits available under the Policy for property damage claims are $50,000. These limits have been exhausted by General's payment of $75,000 in costs incurred by PENCO under the Removal Action Order.

#### 4.   PENCO's Counterclaim Allegations do not Create a Question of Fact

PENCO's counterclaims include several allegations describing costs PENCO incurred performing its obligations under the Removal Action Order as defense costs. *See,* Countercl. at ¶¶50, 51, 53-55. The question of whether these costs are properly characterized as defense or indemnity costs under Oregon law is a legal one. When ruling on this motion, the court is not required to accept the veracity of "legal conclusions cast in the form of factual allegations" or "merely conclusory, unwarranted deductions of fact or unreasonable inferences." *Cholla Ready Mix*, 383 F.3d at 973. Accordingly, these allegations by PENCO do not create a question of fact precluding the Court from granting this motion.

### E.   Because the Order is the Functional Equivalent of a Judgment or Settlement, General's Payment of its Aggregate Limits of Liability Extinguishes its Duty to Defend

Because General paid more than its aggregate limit for property damage claims to reimburse costs incurred by PENCO under the Removal Action Order that are properly characterized as indemnity, General has no further obligation to provide defense or indemnity coverage to PENCO. In this regard, the Policy states "[t]he company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements." Compl., Ex. D at 12. The question of how language regarding the exhaustion of a policy "by payments of judgments or settlements" should be applied in the context of environmental claims was addressed by the court in the *Siltronic*

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 23

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

litigation.   Because the phrase "exhausted by payment of judgments or settlements" was not defined by the primary policies issued by Wausau Oregon law required the court to look to plain meaning.  *Siltronic Corp. v. Employers Ins. Co. of Wausau*, 921 F.Supp.2d 1099, 1105 (D. Or. 2013).  The court stated that while this may seem straightforward, it "cannot be overlooked" that the insurance claim at issue involved an "environmental action by DEQ and EPA" rather than a traditional tort.  *Id.*  It described the importance of this distinction as follows:

> In a typical coverage case, a primary insurer validly exhausts its indemnity limits when it pays a settlement or judgment resolving third party claims…  In an environmental action like this one where the insured is faced with an RAO (Remedial Action Order), however, there is not settlement or judgment in the usual sense of the words.  For these reasons, it is difficult to ascertain precisely at which point indemnity limits may be validly exhausted.

*Id.* (*quoting County of Santa Clara v. United States Fidelity & Guaranty Co.*, 868 F.Supp. 274, 277 (N.D. Cal. 1994)).

The court noted that the OECAA "treats environmental claims as though they were lawsuits" by establishing that the term "suit" encompasses compulsion by or agreement with an environmental regulator.  *Id.* at 1106.  The court then considered *Weyerhaeuser Co. v. Commercial Union Ins. Co.*, 142 Wn.2d 654, 692, 15 P.3d 115 (2001), a Washington Supreme Court decision addressing the interpretation of the phrase "exhausted by payment of judgments or settlements" in the environmental context.  *Id.*  at 1107.  The *Weyerhaeuser* court, like the OECAA, analogized an administrative action in the environmental context to a lawsuit and concluded that in this setting "the payment of funds for costs of complying with a consent decree is the functional equivalent of a settlement, and the underlying insurer's duty to defend ceases once its policy has been exhausted by payments made for this purpose." *Weyerhaeuser*, 142 Wn.2d at 692.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 24

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

The *Siltronic* court adopted this holding from *Weyerhaeuser*. In doing so, it rejected Siltronic's argument that "paying the remediation costs required by DEQ and EPA orders prior to entry of a final consent decree is not sufficient to amount to 'exhaustion by payment of judgments or settlements." *Siltronic*, 921 F.Supp.2d at 1109. The court reasoned that this argument "overlooks that these orders and agreements include language of finality and an intent to create legally enforceable rights and responsibilities to a third party." *Id.* The court also rejected Siltronic's argument that the payment of costs incurred DEQ order should not be treated as payment of "judgments or settlements" because the order did not establish Siltronic's final liability for pollution at the site, reasoning that "environmental actions often do not result in final judgments or settlements for decades, because cleanup is a long process involving many party making claims against one another" and noting that this argument "boils down to asking the court to insert the word 'final' before 'judgments or settlements.'" *Id.*

The Removal Action Order includes "language of finality and an intent to create legally enforceable rights and responsibilities to a third party" and is therefore the functional equivalent of a judgment or settlement. The Removal Action Order requires PENCO to "excavate and/or cap PCB impacted soil on and adjacent to [the Property.]" Compl., Ex. A at 5. It contemplates the possibility that work outside the scope of the SOW may be required and provides that, in such a case "DEQ may require that such additional work be incorporated into the work plan[.]" *Id.* at 6. It (1) requires PENCO to reimburse costs incurred by DEQ;(2) includes stipulated penalties for which PENCO is liable should it fail to comply with any of its provisions; and (3) establishes DEQ's right to enforce the Removal Action Order including, if necessary, by filing a lawsuit. *Id.* at 12, 14-16. It provides that only upon PENCO's satisfactory performance of its obligations will DEQ terminate the Removal Action Order. *Id.* at 17-18.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 25

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON 98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

Because the Removal Action Order is the functional equivalent of a judgment or settlement and General has paid more than its property damage aggregate limit of liability in costs incurred under the Remedial Action Order by PENCO that are properly characterized as indemnity, the aggregate limits are exhausted and General's duties to defend and indemnify PENCO for its claim related to the Site, or any other claim subject to the Policy's property damage aggregate limit, are extinguished.

## F.     PENCO's Counterclaims Are Properly Resolved by This Motion

PENCO has asserted three counterclaims.  All of them are based on the notion that General has not properly exhausted the aggregate limits of the Policy by paying costs properly characterized as indemnity under Oregon law, thereby extinguishing any further obligation to PENCO.

*First*, PENCO seeks a judgment declaring:  (a) that General must pay all defense costs alleged by PENCO; (b) that General "is not entitled to unilaterally and arbitrarily fail and refuse to pay on PENCO's behalf any or all defense costs…described herein" and must otherwise honor its alleged ongoing obligations; (c) PENCO is entitled to costs of suit; (d) PENCO is entitled to such further relief as the court deems appropriate; and (e) PENCO is entitled to attorneys' fees and costs of suit pursuant to ORS 742.061.  Countercl. at 14-15.  All of the declaratory relief sought by PENCO is predicated on its position that General has not properly exhausted its aggregate limits, extinguishing any further obligations to PENCO.

*Second*, PENCO alleges that General has breached its obligations under the Policy by failing to continue to defend PENCO, an obligation that does not exist if the Policy is properly exhausted.  Countercl. at 15-16.

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 26

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1

*Third*, PENCO claims that General's "unilateral claim of exhaustion and premature termination of PENCO's defense" violates ORS 465.484, the OECAA's provision prohibiting unfair claims settlement practices.  This claim could only have merit if the payments General has made do not exhaust the Policy and extinguish any further obligations to PENCO.

## IV.    CONCLUSION

For the reasons outlined above, the undisputed facts presented by the pleadings establish that the property damage aggregate limits of the Policy have been properly exhausted and General has no further obligation to PENCO for claims subject to those aggregate limits.  Therefore, judgment on the pleadings should be entered in favor of General.

Dated this 5th day of January, 2026.

> *s/ Charles A. Henty*
> Charlie Henty, OSB #196001
> Forsberg & Umlauf, P.S.
> 401 Union St., Suite 1400
> Seattle, WA    98101
> Phone:  (206) 689-8500
> chenty@foum.law
> *Attorneys for Plaintiff General Insurance Company*
> *of America*

Plaintiff General Insurance Company of America's
Motion for Judgment on The Pleadings – 27

**FORSBERG & UMLAUF, P.S.**
ATTORNEYS AT LAW
401 UNION STREET • SUITE 1400
SEATTLE, WASHINGTON  98101
(206) 689-8500 • (206) 689-8501 FAX

4915-1409-7790, v. 1