IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

GENERAL INSURANCE COMPANY OF
AMERICA, a foreign insurance company doing
business in the State of Oregon,

                            Plaintiff,

            v.

PENCO, INC., a dissolved Oregon corporation,
and PENINSULA IRON WORKS, an Oregon
business entity,

                            Defendants.

Case No. 3:25-cv-01335-SB

**FINDINGS AND
RECOMMENDATION**

**BECKERMAN, U.S. Magistrate Judge.**

This lawsuit arises from an insurance coverage dispute between Plaintiff General

Insurance Company of America ("General") and its insured, PENCO, Inc. ("PENCO"), formerly

known as Peninsula Iron Works ("Old PIW").[1] General sued PENCO under the Declaratory

---

[1] On September 30, 2025, the parties filed a stipulation of dismissal pursuant to Federal
Rule of Civil Procedure ("Rule") 41(a)(1)(A)(ii), dismissing with prejudice all claims against the
entity now known as Peninsula Iron Works, which is the assumed business name of PIW TSG,
LLC and the parties refer to as "New PIW." (Stipulation Dismissal at 1-2, ECF No. 12; Pl.'s
Status Repot at 1, ECF No. 10; Compl. ¶ 4, ECF No. 1; Def.'s Answer, Affirmative Defs. &
Countercls. ("Def.'s Answer") ¶ 4, ECF No. 14; *see also* Pl.'s Answer & Affirmative Defs. ("Pl.'s

PAGE 1 – FINDINGS AND RECOMMENDATION

Judgment Act, 28 U.S.C. §§ 2201-02, seeking a declaration that it exhausted the aggregate limits of liability under its policy and thus no longer has any obligation to defend or indemnify PENCO in connection with an Oregon Department of Environmental Quality ("ODEQ") environmental cleanup action.

After PENCO filed an answer, affirmative defenses, and counterclaims, General answered and moved for judgment on the pleadings pursuant to Rule 12(c). The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). For the reasons explained below, the Court recommends that the district judge deny General's motion for judgment on the pleadings.

BACKGROUND[2]

I.     FACTS

A.     The Parties

General is a New Hampshire corporation that sells insurance products and maintains its principal place of business in Boston, Massachusetts. (Compl. ¶¶ 1-2; Pl.'s Corp. Disclosure Statement at 1-2, ECF No. 4; Def.'s Answer ¶¶ 1, 43-44; Pl.'s Answer ¶¶ 43-44.) PENCO is an Oregon corporation that owned and operated an industrial machine and fabrication shop located at 6618 North Alta Avenue in Portland, Oregon (the "Site" or "property").[3] (Compl. ¶¶ 3, 7-8 &

---

Answer") ¶ 44, ECF No. 19, admitting that General issued the relevant policy to PENCO/Old PIW).

[2] At this stage of the proceedings, the Court must accept as true "all plausible allegations." *Est. of Soakai v. Abdelaziz*, 137 F. 4th 969, 975 (9th Cir. 2025) (citing *Al Saud v. Days*, 50 F.4th 705, 709 (9th Cir. 2022)), *cert. denied*, No. 25-247, 2026 WL 568296, at *1 (U.S. Mar. 2, 2026).

[3] The parties do not dispute that in evaluating General's motion for judgment on the pleadings, the Court may consider the documents that General attached to its complaint and PENCO incorporated by reference into its answer, affirmative defenses, and counterclaims. (*See* Def.'s Opp'n Pl.'s Mot. J. Pleadings ("Def.'s Opp'n") at 4 n.1, ECF No. 25, stating as much and

PAGE 2 – FINDINGS AND RECOMMENDATION

Ex. A at 3; Def.'s Corp. Disclosure Statement at 2, ECF No. 15; Def.'s Answer ¶¶ 3, 7-8, 45; Pl.'s Answer ¶ 45.)

### B.    The Policy

More than fifty years ago, PENCO purchased a blanket liability policy (the "Policy") from General. (Compl. ¶¶ 1, 13 & Ex. D at 3-4, 12; Def.'s Answer ¶¶ 1, 13, 44; Pl.'s Answer ¶ 44.) The Policy covered the period from February 27, 1973 to February 27, 1976. (Compl. ¶ 13 & Ex. D at 3; Def.'s Answer ¶¶ 13, 44; Pl.'s Answer ¶ 44.) PENCO, however, cancelled the Policy effective August 1, 1974. (Compl. ¶ 14 & Ex. D at 1-2; Def.'s Answer ¶ 14; Pl.'s Answer ¶ 44.)

The Policy's declarations summarized the five sections devoted to the different types of insurance coverage that General issued to PENCO, including, as relevant here, "Section II," which is titled "Liability Coverage."[4] (*See* Compl. Ex. D at 3, 29, setting forth the declarations under "Item 1" through "Item 4" and explaining that under Section II, "'named insured' means the person or organization named in Item 1 of the declarations of the policy") (simplified). The Policy's declarations also incorporated by reference the limits of liability listed in Schedule A, which attached a "liability form" titled "Blanket Liability Insurance C-10." (*See id.* at 3-4, 12-14,

---

that PENCO does not object to Part III.C. of General's motion; Pl.'s Reply Supp. Mot. J. Pleadings ("Pl.'s Reply") at 1, ECF No. 26, emphasizing that PENCO "does not dispute" that General's exhibits and appendices are "properly before the Court"; *see also* Pl.'s Mot. J. Pleadings ("Pl.'s Mot.") at 12-14, ECF No. 23, demonstrating that in Part III.C., General addresses whether the Court may consider Exhibits A through F to its complaint and Appendices A through C to its motion, the latter of which PENCO "incorporated by reference in [its] counterclaims").

[4] "The term 'declarations' . . . is an unambiguous reference to a page of the policy itself." *Bergmann v. Hutton*, 101 P.3d 353, 359 (Or. 2004). "In common parlance, it is the first page of an insurance policy and summarizes the terms of that policy, including, among other things, setting out the insurer's limit on liability." *Id.*

PAGE 3 – FINDINGS AND RECOMMENDATION

providing that Schedule A is "attached to[] and form[ed] a part of the policy" and listing "C-10" in the lower left corner of the "Blanket Liability Insurance (Coverage Supplement)") (simplified).

Schedule A provided that the Policy's limits of liability for "property damage" under Coverage B were $25,000 for "each occurrence" and $25,000 in "aggregate." (*Id.* at 4) (caps omitted). Schedule A's attached Blanket Liability Insurance form expanded on these limits of liability and provided that Coverage B was triggered if an "occurrence" caused the "property damage":

> With respect to [any] of the foregoing coverages as have become effective under the provisions of the declarations page of this policy, the company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence. The company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient. The company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the company's liability has been exhausted by payment of judgments or settlements.
>
> . . . .
>
> For the purpose of determining the limit of the company's liability, all . . . property damage arising out of continuous or repeated exposure to substantially the same general conditions shall be considered as arising out of one occurrence.
>
> Regardless of the number of insureds under this policy, the company's liability is limited as [described below.]
>
> . . . .
>
> The total liability of the company for all damages because of all property damage sustained by one or more persons or organizations as a result of any one occurrence shall not exceed the limit of property damage liability stated in the declarations as applicable to "each occurrence." The total liability of the company for all damages because of all property damage to which this coverage applies shall not exceed the limit of property damage liability stated in the declarations as "aggregate."

PAGE 4 – FINDINGS AND RECOMMENDATION

Such aggregate limit shall apply separately with respect to each project away from premises owned by or rented to the named insured.

Aggregate limits of liability as stated in this policy shall apply separately to each annual policy period.

(Compl. Ex. D at 12-14) (bold omitted).

In addition to the declarations, Schedule A, and the attached Blanket Liability Insurance form, the Policy included definitions that "appli[ed] only to Section II." (*Id.* at 28-29) (simplified). In this section, the Policy defined "occurrence" as "an event including continuous or repeated exposure to conditions, which results in . . . property damage neither expected nor intended from the standpoint of the insured[.]" (*Id.* at 29) (bold omitted). The Policy also defined "property damages" as either (1) "physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom," or (2) "loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period[.]" (*Id.*) (bold omitted).

### C.    Underlying Events

The principal Site in question is a Portland-based industrial machine and fabrication shop that PENCO owned and operated. (Compl. ¶¶ 7-9 & Ex. A at 3; Def.'s Answer ¶¶ 7-9, 45; Pl.'s Answer ¶ 45.) The Site's "industrial machine and fabrication shop has been active since the early 1900s and [at various times] included a machine shop, foundry, pattern shop, pattern loft, chipping room and air compressor." (Compl. Ex. A at 3.) The Site's "machine shop remains active today" and the "southwest and southern portion of the Site include an indoor machine pit, an[] outdoor covered metal shaving container, and new and waste oil storage." (*Id.*)

Polychlorinated biphenyls ("PCBs") are "often associated with historical operations at machine and fabrication shops" and are "present at high concentrations in surface and subsurface

PAGE 5 – FINDINGS AND RECOMMENDATION

soil on and adjacent to the [Site.]"[5] (*Id.* at 3-4.) In 2011, the City of Portland (the "City") conducted "source control investigations" and several rounds of sampling adjacent to the Site. (*Id.* at 4.) The City detected high PCB concentrations in "multiple soil samples, including two composite surface samples within [ten] feet of [the Site's] metal shavings container and waste storage." (*Id.*)

###     1.    Relevant Statutory Framework

The Oregon Hazardous Waste and Hazardous Materials Act, Oregon Revised Statutes ("ORS") "chapter 465," *Rudder v. Hosack, 506 P.3d 1156, 1162 (Or. Ct. App. 2022)*, "set[s] up a scheme of strict liability for owners, operators, and others regarding investigation and cleanup of environmental contamination." *Certain Underwriters v. Mass. Bonding & Ins. Co.*, 230 P.3d 103, 119 (Or. Ct. App. 2010) (citing OR. REV. STAT. § 465.255(1)), *adh'd to as modified on recons.*, 260 P.3d 830, 832-35 (Or. Ct. App. 2011). Specifically, ORS § 465.255(1) provides that certain "persons," including "[a]ny owner or operator at or during the time of the acts or omissions that resulted in the release," "shall be strictly liable for . . . remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release." OR. REV. STAT. § 465.255(1)(a); *see also* OR. REV. STAT. § 465.200(16) ("'Remedial action costs' means reasonable costs which

---

[5] The Environmental Protection Agency ("EPA") regulates PCBs under the Toxic Substance Control Act and its implementing regulations. *See Am. Unites for Kids v. Rousseau, 985 F.3d 1075, 1081-82 & n.2 (9th Cir. 2021)* (first citing 15 U.S.C. §§ 2601-2629; and then citing 40 C.F.R. §§ 761.1-.398). "According to the EPA, PCBs 'do not readily break down once in the environment' and therefore 'can remain for long periods cycling between air, water and soil.'" *Revitalizing Auto Cmtys. Env't Resp. Tr. v. Nat'l Grid USA*, 92 F.4th 415, 425 (2d Cir. 2024) (quoting EPA, *Learn About Polychlorinated Biphenyls*, https://www.epa.gov/pcbs/learn-about-polychlorinated-biphenyls (last updated Apr. 16, 2026) [https://perma.cc/7PGH-XSHC]). PCBs can also "cause a 'variety of adverse health effects,' including potential carcinogenic effects in humans." *Id.*

are attributable to or associated with a removal or remedial action at a facility, including but not

limited to the costs of administration, investigation, legal or enforcement activities, contracts and

health studies."); *Goldingay v. Progressive Cas. Ins. Co.*, No. 3:17-cv-01491-SI, 2018 WL

3689899, at *4-5 (D. Or. Aug. 3, 2018) ("[T]he term 'remedial action costs' refers only to those

costs . . . attributable to or associated with the carrying out of [actual] physical processes.")

(simplified).

Oregon's "statutory scheme is designed to encourage the prompt cleanup of

environmental contamination, short of an enforcement action." *Certain Underwriters*, 230 P.3d

at 119. Consequently, Oregon's statutory scheme "as a whole regulates parties who are liable for

environmental contamination as well as those who are only 'potentially liable.'" *Id.* It also

includes "contribution-related statutes" that permit "[a]ny person who is liable or potentially

liable under ORS [§] 465.255 [to] seek contribution from any other person who is liable or

potentially liable under ORS [§] 465.255" and "an insurer that has paid an environmental claim

to 'seek contribution from any other insurer that is liable or potentially liable.'" *Id.* (first quoting

OR. REV. STAT. § 465.257(1); and then quoting OR. REV. STAT. § 465.480(4)).

### 2.    PENCO's Environmental Claims[6]

In February 2022, PENCO and ODEQ entered into a "voluntary letter agreement," under

which PENCO agreed to "investigate hazardous substances located on and adjacent to the [Site

---

6. "'Environmental claim' means a claim for defense or indemnity submitted under a general liability insurance policy by an insured facing, or allegedly facing, potential liability for bodily injury or property damage arising from a release of pollutants onto or into land, air or water." OR. REV. STAT. § 465.475(1); *see also id.* § 465.475(2) ("'General liability insurance policy' means any contract of insurance that provides coverage for the obligations at law or in equity of an insured for bodily injury, property damage or personal injury to others.").

and] . . . pay [O]DEQ's review and oversight costs in accordance with" ORS § 465.255. (Compl. Ex. A at 4-5.)

Three months later, in May 2022, ODEQ, acting in coordination with the EPA and City, used an "incremental sampling methodology" to collect surface samples in Cathedral Park, which is adjacent to and southwest of the Site. (*Id.* at 3-4, 19.) ODEQ detected the "highest PCB concentrations . . . immediately downslope and southwest of the [Site.]" (*Id.* at 4.) Later that same year, in October 2022, Union Pacific Railroad ("Union Pacific") investigated the surface soil along its railroad right-of-way, located adjacent to the Site. (*Id.* at 4, 19.) Similar to ODEQ, Union Pacific detected the "highest PCB concentrations . . . adjacent to the [Site.]" (*Id.*)

Between November 2022 and January 2023, PENCO conducted a "focused site investigation" and obtained samples that identified "high concentrations of PCBs in surface and subsurface soils" and the "highest concentrations" under the asphalt apron abutting its building's southwest side and "adjacent to [its] metal shavings container and waste storage." (*Id.* at 3.) Shortly thereafter, on May 22, 2023, PENCO "stipulated, agreed, and approved" of a "Consent Order" that ODEQ issued to PENCO pursuant to ORS § 465.260(4).[7] (*Id.* at 1, 18) (caps omitted).

---

[7] "Under ORS [§] 465.260(4), [O]DEQ may order a person liable [under ORS § 465.255] for environmental harm 'to conduct any removal or remedial action or related actions necessary to protect the public health, safety, welfare and the environment.'" *Rudder*, 506 P.3d at 1162 n.1 (quoting OR. REV. STAT. § 465.260(4)); *see also* OR. REV. STAT. § 465.260(4) (addressing ODEQ's authority with respect to a "person liable under ORS [§] 465.255" and ability to "issu[e] an order specifying the removal or remedial action the person must take"). Oregon's statutes define a "[p]erson" as "an individual, trust, firm, joint stock company, joint venture, consortium, commercial entity, partnership, association, corporation, commission, state and any agency thereof, political subdivision of the state, interstate body or the federal government including any agency thereof." OR. REV. STAT. § 465.200(13) (formerly ORS § 465.200(21) and operative as of January 1, 2024); (*cf.* Compl. Ex. A at 4, "[PENCO] is a 'person' within the meaning of ORS § 465.200(21).")

PAGE 8 – FINDINGS AND RECOMMENDATION

ODEQ and PENCO's express "purpose" and "mutual objective" in entering the Consent Order was to "protect public health, safety, and welfare and the environment by performing a Removal Action in a manner that complies with the applicable provisions of ORS [§§] 465.200 through 465.420 and regulations promulgated thereto." (*Id.* at 2) (simplified). Relatedly, ODEQ's findings, which PENCO did not admit, focused on the City, ODEQ, Union Pacific, and PENCO's investigations and detection of high concentrations of PCBs on and adjacent to the Site:

> E.      PCBs are present at high concentrations in surface and subsurface soil on and adjacent to [the Site]. The PCB impacted soil presents a complete exposure pathway to [PENCO] employees who work near the metal shavings and waste storage containers; [PENCO] employees and community members who walk along or cross the railroad tracks; and community members who use Cathedral Park. Bare soil contaminated with PCBs on and adjacent to [the Site] may be migrating offsite through stormwater transport.
>
> . . . .
>
> H.      A soil excavation and/or capping is urgently needed to reduce exposure of site workers and community members to high concentrations of PCB impacted soils on and adjacent to [the Site], and to minimize the offsite transport of PCBs in stormwater. Additional soil sampling is urgently needed in Cathedral Park to determine if additional areas of the park are contaminated with high concentrations of PCBs.

(*Id.* at 3-4.)

The Consent Order also described the work that ODEQ required PENCO to perform. (*See id.* at 5-6, 20-23, setting forth Section "5. Work to be Performed" and Exhibit B to the Consent Order, which is a Scope of Work ("SOW") that includes a Site map identifying "minimum action areas") (all caps omitted). With respect to this issue, the Consent Order cited PENCO's ongoing work under the February 2022 voluntary cleanup letter agreement, the SOW, a future ODEQ-reviewed and approved work plan, and modifications related to additional work that ODEQ may

PAGE 9 – FINDINGS AND RECOMMENDATION

deem "necessary to address unanticipated threats and were subject to [a] dispute resolution"

provision:

A.    Timely and Temporary Cover of Bare PCB Impacted Soil

[PENCO] shall place and maintain a temporary cover on bare surface soils impacted by PCBs on and adjacent to [the Site] to protect public health, safety, and welfare and the environment. The PCB impacted soils will be further addressed in Subsection B and [an ODEQ] approved work plan. This work is on-going and began under the voluntary cleanup letter agreement.

B.    PCB Impacted Soil Removal Action

[PENCO] shall excavate and/or cap PCB impacted soil on and adjacent to [the Site] in accordance with [Oregon Administrative Rules ("OAR")] Chapter 340 Division 122, the terms and schedule set forth in the [SOW] . . . contained in Exhibit B to this [Consent Order], and the terms and schedules set forth in any [O]DEQ-approved work plan. Once approved by [O]DEQ, a work plan is deemed to be incorporated into and made a fully enforceable part of this [Consent Order].

C.    Additional Measures

. . . .

[O]DEQ may determine that, in addition to work specified in the SOW or an approved work plan, additional work is necessary to satisfy the SOW and OAR Chapter 340 Division 122 or . . . address unanticipated threats to human health or the environment. [O]DEQ may require that such additional work be incorporated into the applicable work plan by modification and/or be performed in accordance with a [O]DEQ-specified schedule. [PENCO] must modify the work plan and/or implement the additional work in accordance with [O]DEQ's directions and schedule, or invoke dispute resolution under Subsection 7.L. within [fourteen] days of receipt of [O]DEQ's directions.

(*Id.* at 5-6.)

Like Section 5 of the Consent Order, the SOW required PENCO to continue with its ongoing work under the "voluntary cleanup letter agreement," timely and temporarily cover PCB-impacted soil to "prevent direct contact with highly contaminated surface soil," and excavate "and/or" cap PCB-impacted soil to "protect public health, safety and welfare, and the

PAGE 10 – FINDINGS AND RECOMMENDATION

environment where highly contaminated surface soil is accessible to [the] public." (*Id.* at 20.) The SOW also set a schedule for PENCO to cover PCB-impacted soil and submit draft and final "PBC Impacted Soil Excavation and/or Capping Work Plan(s)" to ODEQ. (*Id.*) Further, the SOW provided that "as necessary to reflect or incorporate newly discovered information and/or environmental conditions, [PENCO] may amend all work plans" and "[a]dditional work plans and work plan amendments are subject to [O]DEQ review and approval and will be processed according to schedules negotiated between the parties at the time of each phase change or task addition." (*Id.*)

In addition to these provisions, the SOW attached and incorporated by reference a geodetic survey titled "Removal Action Scope of Work Minimum Action Areas." (*Id.* at 21-23.) The geodetic survey provided an overhead view of the Site and surrounding areas, included elevation contour lines, and identified the areas on and adjacent to the Site that PENCO needed to temporarily cover or perform soil excavation and/or capping. (*Id.* at 23.) The geodetic survey labeled the excavation and/or capping areas as "DU10" and "DU10 plus." (*Id.*) The City, ODEQ, Union Pacific, and PENCO's investigations detected "hot spot concentrations" of PCBs in these areas, both of which were in Cathedral Park and downslope from and adjacent to the southwest side of PENCO's building and its metal shavings container and waste storage. (*Id.* at 3-4, 19, 21, 23.)

The SOW provided that PENCO's "work plan(s)" must include a description of its proposed excavation and/or capping and address the "hot spot concentrations and locations" depicted in the attached survey. (*Id.* at 21.) The Consent Order also provided that "[a]dditional soil sampling is urgently needed in Cathedral Park to determine if additional areas of the park are contaminated with high concentrations of PCBs" and that PENCO's "PCB Impacted Soil

PAGE 11 – FINDINGS AND RECOMMENDATION

excavation and/or Capping Report" must include "[a] discussion of any sampling procedures and results, if applicable." (*Id.* at 4, 22; *see also* Def.'s Answer ¶ 45, alleging that the Consent Order required PENCO to investigate the release of PCBs in "portions of Cathedral Park"; *cf.* Pl.'s Answer ¶ 45, denying PENCO's allegations "to the extent [that they] conflict with the [Consent] Order").

Following ODEQ's issuance of the Consent Order on May 22, 2023, PENCO retained a consultant, EVREN Northwest, Inc. ("ENW"), to assist with its investigation, sampling, and submission of plans and reports to ODEQ.[8] (Compl. ¶¶ 8-9, 21; Def.'s Answer ¶¶ 8-9, 21, 45, 47; Pl.'s Answer ¶¶ 45, 47.) In its Work Plan dated July 28, 2023, ENW explained that to obtain a "better understanding of the distribution of PCB-impacted soils in th[e] area," ENW planned to divide, analyze, and submit a supplement on soil samples that it obtained from DU10 and DU-Plus:

> Maul Foster Alongi ("MFA"), investigating on behalf of ODEQ, reported (June 24, 2022) for DU10 a total PCB concentration of 3.45 [milligrams per kilogram] obtained from one Incremental Sampling Methodology ("ISM[")]) sample consisting of 50 soil aliquots obtained on a grid pattern established across the decision unit at depth of two (2) inches below surface grade. ENW requested of ODEQ, and obtained, permission to submit the required Removal Action Work Plan for DU10 in stages; submission of Work Plan to conduct further soil sampling and analysis within the area of DU10 followed by submission of an Addendum/Supplement to the Work Plan that presents sampling results and proposed soil excavation and/or capping actions for DU10 intended to mitigate

---

[8] General attaches as Appendices A and C to its motion ENW's reports titled "Removal Action Work Plan" (the "Work Plan") and "Surface Material Investigation" (the "Investigation Report"), which PENCO incorporates by reference in support of its counterclaims. (Pl.'s Mot. App. A at 1-43 & App. C at 1-169; *cf.* Def.'s Answer ¶¶ 48, 51, 53, 63, 67, 76; *see also* Pl.'s Answer ¶¶ 48, 51, 53, denying allegations that conflict with the Work Plan and a related email, stating that General lacks sufficient knowledge to admit or deny (and thus denies) that the Consent Order required PENCO to obtain samples and perform other "investigation work" and that ENW summarized these results in an Investigation Report that PENCO provided to ODEQ, and denying and finding it unnecessary to respond to PENCO's "legal conclusion" about "[a]ll of the work" that ENW performed and whether "any remedial action would be required at the Site").

PAGE 12 – FINDINGS AND RECOMMENDATION

> any imminent threats to human health and safety or to the environment and to prevent or reduce any potential for stormwater transport of PCBs.
>
> . . . .
>
> Soil sampling will be conducted in Action Areas DU10 and DU10-Plus to provide a better understanding of the distribution of PCB-impacted soils in this area. A supplement to this Work Plan will be prepared that describes potential proposed soil removal and/or capping actions for these areas.
>
> . . . .
>
> . . . DU10 . . . will be divided into six sub-decision units (DU10-a through DU10-f, based on surface topographic contours and onsite communications with ODEQ on June 7, 2023 regarding inferred surficial flow paths) and . . . DU10 Plus will be divided into two sub[-]decision units (DU10-Plus-a and DU10-Plus-b).
>
> . . . .
>
> In each sub-[decision unit], one ISM sample will be collected from a depth of 0.2 feet [below ground surface] and analyzed for total PCBs as Aroclors. Incrementally deeper ISM samples (0.5-foot depth [below ground surface] increments) will be collected if shallow samples from that sub-[decision unit] exceed[] the screening [risk-based concentration] of 0.52 [milligrams per kilogram].
>
> . . . .
>
> Once sampling data is available, a supplement to this Work Plan will be prepared presenting findings and proposing soil removal and/or capping consistent with the Remedial Action Objectives identified in Section 2.1.

(*Id.* at 5-7; *see also id.* at 4, providing a list of acronyms and abbreviations that ENW used throughout the Work Plan; *id.* at 10, 12, 17, addressing the Work Plan schedule and "supplement" that ENW intended to submit to ODEQ regarding the "further characterization [soil] samples" that it obtained from the sub-decision units DU10-a to DU10-f, DU10-Plus-a, and DU10-Plus-b) (simplified).

ODEQ approved ENW's proposed Work Plan on August 3, 2023. (Pl.'s Mot. App. B at 2.) ODEQ later recognized that under the Work Plan, ENW's "sampling of the DU10 and DU10-

PAGE 13 – FINDINGS AND RECOMMENDATION

Plus areas[] . . . would inform the extent of the excavation" of soils contaminated with PCBs.

(*Id.*)

## II.    PROCEDURAL HISTORY

After PENCO tendered Site-related environmental claims to General for defense and indemnity on June 21, 2023, General located the Policy and sent a follow-up letter to PENCO on March 13, 2024, agreeing to participate in its defense subject to a reservation of rights.[9] (*See* Compl. ¶¶ 10-11 & Ex. B at 1-7; Def.'s Answer ¶¶ 9-10, 43, 46; Pl.'s Answer ¶¶ 43, 46, stating as much and identifying entities that administered PENCO's claim on General's behalf; *see also* Compl. Ex. F at 1-2, confirming the date on which General received PENCO's tender of an environmental claim related to the "Site" and listing the Consent Order's assigned document number).

On April 26, 2024, PENCO's counsel emailed the Work Plan and related documents to General and requested an "immediate review and approval of [ENW's] . . . [c]ost [p]roposal for the next stage of investigation in Cathedral Park." (Def.'s Answer ¶¶ 47-48; Pl.'s Answer ¶¶ 47-48.) On May 23, 2024, General responded that ENW's costs were "reasonable" to "complete additional delineation of PCBs impacts to amend the remedial plan." (Def.'s Answer ¶ 49; Pl.'s Answer ¶ 49.)

///

---

[9] Although PENCO "originally emailed notice of this matter" to General's claim representative on March 31, 2022, PENCO did not attach the Policy to its tender and General's claim representative completed an unsuccessful search for the Policy on September 14, 2023. (Compl. Ex. B at 1-2, 5 & Ex. F at 1.) In a response letter dated December 27, 2023, PENCO "identified a specific Blanket Liability Policy bearing [the correct] policy number" and cited a 1974 court case referencing the Policy (*Id.* Ex. B at 2.) General's claim representative then "resumed its policy search," located the Policy, and sent PENCO a reservation of rights letter. (*Id.*)

PAGE 14 – FINDINGS AND RECOMMENDATION

One week later, on May 30, 2024, PENCO's counsel emailed General a summary of their recent correspondence regarding ENW's investigation and sampling in Cathedral Park and proposed costs. (Def.'s Answer ¶ 50; Pl.'s Answer ¶ 50.) PENCO's counsel also maintained that ENW's work constituted defense costs under ORS § 465.480(7).[10] (Def.'s Answer ¶ 50; Pl.'s Answer ¶ 50.)

On June 18, 2024, ODEQ sent PENCO an email and attached letter advising that if PENCO did not begin performing its work in DU10 and DU10-Plus by July 8, 2024, ODEQ "may consider enforcement actions." (Pl.'s Mot. App. B at 1-3; Def.'s Answer ¶ 51; Pl.'s Answer ¶ 51.) ODEQ explained that PENCO previously obtained the relevant "permits and access agreements" and that there was a "temporar[y] . . . hold while [PENCO's] insurance company review[ed] the Work Plan," which was "not an acceptable reason to delay" work that was "necessary to protect public health, safety and welfare, and the environment." (Pl.'s Mot. App. B at 1.)

Less than an hour later, PENCO's counsel forwarded ODEQ's email and attached letter to General. (*Id.*) PENCO's counsel emphasized that he had not received any response to his May 30 email, ODEQ was "threatening enforcement action due to continued delays in proceeding with the investigation required by the Consent Order," he wanted to confirm that General would "reimburse [PENCO] for the anticipated expenditures," and he did not "believe that there [was] any credible basis for [General's] position that . . . [the] expenditures [were] 'indemnity' [costs]." (*Id.*)

///

---

[10] As discussed further below, ORS § 465.480(7) "establishes . . . rebuttable presumptions for categorizing environmental expenditures by insurers[.]" *Siltronic Corp. v. Emps. Ins. Co. of Wausau*, 176 F. Supp. 3d 1033, 1034 (D. Or. 2016) (citing OR. REV. STAT. § 465.480(7)).

PAGE 15 – FINDINGS AND RECOMMENDATION

Ten days later, on June 28, 2024, General responded to PENCO's counsel's emails and advised that its consultant reviewed the invoices that he submitted and determined that the costs that PENCO incurred before and after ODEQ's issuance of the Consent Order constituted "defense" and "indemnity" costs, respectively. (Def.'s Answer ¶ 52; Pl.'s Answer ¶ 52.) Based on its consultant's determination, General advised PENfCO that there was "only $5,58[6].09 in indemnity limits remaining under the Policy[.]" (Def.'s Answer ¶¶ 12, 52; Pl.'s Answer ¶ 52; Compl. ¶ 12; *see also* Compl. Ex. C at 2, correcting the purported total remaining in indemnity limits).

Seeking to avoid enforcement actions related to its failure to comply with the Consent Order and commence work in DU10 and DU10-Plus by July 8, 2024, PENCO proceeded with the "investigation work" and sampling contemplated under the Work Plan. (*See* Def.'s Answer ¶¶ 51, 53; Pl.'s Mot. App. B at 1-3); *infra* note 8 (detailing paragraph fifty-three of General's answer).

On July 3, 2024, General also issued checks to PENCO in the amounts of $36,424.18, $34,706.95, $34,706.96, and $36,424.18, for a total of $142,262.27. (*See* Compl. Ex. E at 1-4, reflecting that none of the checks include memo line or purpose lines or transaction details like the payment's reason; Def.'s Answer ¶¶ 22-25, 46, 52, 56, admitting that General issued PENCO checks for "defense costs" and denying that any checks covered "indemnity costs"; *but cf.* Compl. ¶¶ 21-25, alleging that the first and last checks (i.e., $72,848.36 in total) were payments for "defense costs" and second and third checks (i.e., $69,413.91 in total) were payments for "indemnity costs"; Compl. Ex. C at 2, making the same claim the following year and citing these totals).

///

PAGE 16 – FINDINGS AND RECOMMENDATION

On November 25, 2024, ENW issued its Investigation Report in which it detailed the results of the work that it performed in DU10 and DU10-Plus to "further characterize and delineate [PCBs] . . . in surface soil" and "provide a better understanding of the lateral and vertical distribution of PCB-impacted sols in . . . DU10 and DU10-Plus in Cathedral Park." (Pl.'s Mot. App. A at 6-7.) ENW also sent a copy of the Investigation Report to ODEQ. (Def.'s Answer ¶ 53.)

On January 3, 2025, PENCO cashed the $142,262.27 in checks that it received from General. (Compl. Ex. E at 1-4, listing the "paid check information" and associated "date") (simplified).

Approximately four months later, on April 25, 2025, PENCO's counsel emailed General $67,406.79 in "additional . . . environmental invoices from ENW, with dates spanning from March 28, 2024 through February 27, 2025[.]" (Compl. ¶ 12 & Ex. C at 2, 5; Def.'s Answer ¶¶ 12, 54; Pl.'s Answer ¶ 54.) General maintained spreadsheets summarizing the invoices that it covered in (1) its June 28, 2024 email, and (2) received on or about April 25, 2025. (Compl. Ex. C at 4-5; *see id.* at 2-3, 5, enclosing General's "June 28, 2024" and "May 20, 2025 Cost Categorization Table[s]," the latter of which covered only PENCO's recent submission of "$67,406.79" in invoices, which with the exception of an invoice dated March 28, 2024, postdate May 1, 2024; *id.* at 5, identifying May 20, 2025 as the date on which General last received "supplemental backup documents" related to the invoices that PENCO submitted on April 25, 2025).

In its June 2024 table, General assigned (1) $80,473.61 in invoices dated November 23, 2021 to April 26, 2024 to its column titled "non-questioned investigation" (i.e., defense costs), and (2) $69,413.91 in invoices dated May 18, 2023 to February 29, 2024 to its column titled

PAGE 17 – FINDINGS AND RECOMMENDATION

"non-questioned remedial" (i.e., indemnity costs). (*Id.* Ex. C at 4) (simplified). By contrast, in its May 2025 table, General added columns in which it provided a general description of and listed the service period start and end dates associated with each invoice. (*Id.* Ex. C at 5.) General assigned (1) a $8,731.74 invoice dated February 27, 2025 to its defense costs column because it involved "[a]ctivities to distinguish PCB contamination in Cathedral Park from the release of PCBs in the N[orth] Bradford St. right-of-way" and "meeting with ODEQ," and (2) the remaining $58,675.04 in invoices dated March 28, 2024 to January 30, 2025 to its indemnity costs column. (*Id.*)

On June 4, 2025, General issued checks to PENCO in the amounts of $5,586.09 (i.e., the amount that General deemed remaining in indemnity limits under the Policy, which represented $75,000 minus the June 2024 table's indemnity column total of $69,413.91) and $8,731.75 (i.e., the only invoice on the May 2025 table that General characterized as "non-questioned investigation"/defense costs). (Compl. ¶¶ 12, 25 & Ex. C at 2, 4-5; Def.'s Answer ¶¶ 12, 25, 57; Pl.'s Answer ¶ 57.)

PENCO did not cash the last two checks that it received from General. (Def.'s Answer ¶ 25.) On June 16, 2025, two weeks after General issued the checks, PENCO received a letter from General advising that the check for $5,586.09 exhausted the aggregate indemnity limits under the Policy, General would "only pay reasonable and necessary defense costs incurred on or before June 4, 2025, the date of its final indemnity payment," and General intended to close PENCO's file after reviewing and processing any defense invoices that it received within the next thirty days. (Compl. ¶¶ 12, 25, 29 & Ex. C at 1-5; Def.'s Answer ¶¶ 12, 25, 29, 57; Pl.'s Answer ¶ 57.)

///

PAGE 18 – FINDINGS AND RECOMMENDATION

The following day, June 17, 2025, PENCO's general counsel responded to General's letter, disputed General's assertion that PENCO exhausted its aggregate indemnity limits under the Policy, and informed General that its action were "impairing [PENCO's] ability to defend itself" and potentially exposing PENCO to "liability for remedial action costs disproportionate to its equitable share under Oregon's joint and several liability framework." (Def.'s Answer ¶ 58; Pl.'s Answer ¶ 58.)

About a month and a half later, on July 30, 2025, General sued PENCO under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. General invokes the Court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), and seeks a declaration that it exhausted the Policy's limits of liability "through indemnity payments" and the "functional equivalent of 'settlement of judgments'" and therefore "owes no further duty to defend or indemnify [PENCO] for response costs [that it] incurs at the Site" or for "any other claim[] under the Policy[.]"[11] (Compl. at 1-2, 8-9.)

On September 4, 2025, about two weeks before General effected service of the summons and complaint, PENCO sent a notice of unfair environmental claims settlement practices to General and Oregon's Director of the Department of Consumer and Business Services ("DCBS").[12] (Def.'s Answer ¶ 61; Pl.'s Answer ¶ 61-62; Acceptance/Acknowledgement Serv. at 1, ECF No. 8.)

---

[11] "[T]he Declaratory Judgment Act . . . only creates a remedy" and does not provide an "independent basis" for federal subject matter jurisdiction. *Stock W., Inc. v. Confederated Tribes of the Colville Rsrv.*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citing 28 U.S.C. § 2201).

[12] ORS § 465.484 proscribes certain "unfair environmental claims settlement practices" and provides that an aggrieved insured "may apply to the circuit court for the county in which [it] resides, or any other court of competent jurisdiction, to recover the actual damages sustained, together with the costs of the action, including reasonable attorney fees and litigation costs." OR. REV. STAT. § 465.484(1), (4)(a). Twenty days before doing so, however, an insurer "must provide written notice of the basis for the cause of action to the insurer and office of the Director of the

PAGE 19 – FINDINGS AND RECOMMENDATION

On September 30, 2025, after obtaining an extension of time in which to respond to General's complaint, PENCO filed its answer, affirmative defenses, and counterclaims for breach of contract and unfair environmental claims settlement practices, and a declaration under Section 2201. (Def.'s Answer at 14-15; Minute Order & Pl.'s Unopposed Mot. Extension Time at 1, ECF Nos. 6-7.) General filed its answer and affirmative defenses to PENCO's counterclaims on November 14, 2025, and then moved for judgment on the pleadings. (Pl.'s Answer at 9; Pl.'s Mot. at 4.)

After the parties completed their briefing, the Court heard oral argument on General's motion for judgment on the pleadings and took the matter under advisement on April 8, 2026. (ECF No. 27.)

## LEGAL STANDARDS

Rules 12(c) provides that "[a]fter the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings." FED. R. CIV. P. 12(c). "Analysis under Rule 12(c) is substantially identical to analysis under Rule 12(b)(6)," *Pit River Tribe v. Bureau of Land Mgmt.*, 793 F.3d 1147, 1155 (9th Cir. 2015) (quoting *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012)), "[b]ecause motions for judgment on the pleadings are 'functionally identical to Rule 12(b)(6)' motions[.]" *Webb v. Trader Joe's Co.*, 999 F.3d 1196, 1200 (9th Cir. 2021) (quoting *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)); *see also Dworkin v. Hustler Mag. Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989) ("The principal difference between motions filed pursuant to Rule 12(b) and Rule 12(c) is the time of filing.").

---

[DCBS.]" *Id.* § 465.484(4)(b). When an "insurer fails to resolve the basis for the action within the [twenty]-day period . . . , the insured may bring the action without any further notice." *Id.* § 465.484(4)(b).

PAGE 20 – FINDINGS AND RECOMMENDATION

Evaluating a motion for judgment on the pleadings therefore requires a court to "assess whether the complaint 'contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Chavez*, 683 F.3d at 1108 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), which quoted *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see also Cafasso*, 637 F.3d at 1054 n.4 (noting that *Iqbal* applies to Rule 12(c) motions); *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Chavez*, 683 F.3d at 1108-09 (quoting *Iqbal*, 556 U.S. at 678). However, "[m]ere conclusory statements in a complaint and 'formulaic recitation[s] of the elements of a cause of action' are not sufficient." *Id.* (quoting *Twombly*, 550 U.S. at 555). Accordingly, "a court discounts conclusory statements, which are not entitled to the presumption of truth, before determining whether a [plaintiff's] claim is plausible." *Id.* (citing *Iqbal*, 556 U.S. at 678).

## DISCUSSION

General moves for judgment on the pleadings pursuant to Rule 12(c). (Pl.'s Mot. at 4, 27.) Relying on its complaint and attached exhibits and documents that PENCO incorporated by reference into its answer, affirmative defenses, and counterclaims, General argues that it is entitled to entry of judgment in its favor because the undisputed facts establish that it exhausted the Policy's aggregate limits of liability for property damage and, as a consequence, owes "no further obligation" to PENCO for environmental claims "subject to those aggregate limits."[13] (*Id.* at 12-14, 27.)

---

[13] As the parties agree (*see* Pl.'s Mot. at 13-37; Def.'s Opp'n at 6-12), because the Court sits in diversity, it must apply Oregon law. *See Or. Clinic, PC v. Fireman's Fund Ins. Co.*, 75 F.4th 1064, 1068 (9th Cir. 2023) (citing *Alexander Mfg., Inc. Emp. Stock Ownership Plan & Tr. v. Ill. Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009)); *Pranger v. Or. State Univ.*, No. 23-35393,

PAGE 21 – FINDINGS AND RECOMMENDATION

## I.    APPLICABLE LAW

The Oregon Environmental Cleanup Assistance Act ("OECAA"), OR. REV. STAT. §§ 465.475-.485, "governs 'insurance coverage disputes involving insureds who face potential liability for their ownership of or roles at polluted sites' in Oregon." *Nat'l Surety Corp. v. TIG Ins. Co.*, No. 23-35575, 2024 WL 4850828, at *1 (9th Cir. Nov. 21, 2024) (quoting OR. REV. STAT. § 465.478)). The Oregon legislature enacted the OECAA to "assure the prompt availability of insurance proceeds due and owing from the insurance companies whose insureds face potential liability for their ownership of or roles at polluted sites in this state." *Cont'l Cas. Co. v. Argonaut Ins. Co.*, 567 P.3d 1059, 1063 (Or. 2025) (quoting *Allianz Glob. Risks v. ACE Prop. & Cas. Ins. Co.*, 483 P.3d 1124, 1138 (Or. 2021), *adh'd. to as modified on recons.*, 489 P.3d 115, 117-19 (Or. 2021)), *adh'd to as modified on recons.*, 574 P.3d 476, 476-77 (Or. 2025). The OECAA does so by "permitting an insured to target one among multiple insurers for payment of all or part of an environmental claim, while at the same time ensuring fairness to the targeted insurer that has paid a disproportionate share of the [environmental] claim by providing the targeted insurer with a right of contribution from the other insurers[.]" *Id.* at 1066 (citing *Allianz*, 483 P.3d at 1143).

### A.    Rebuttable Presumptions

Under ORS § 465.480(7), there is a "rebuttable presumption" that certain environmental response costs are either "defense costs payable by the insurer" or, alternatively, "indemnity

---

2024 WL 3326068, at *1 n.1 (9th Cir. July 8, 2024) ("In [a] diversity action, [a federal court] appl[ies] the law of the forum state, here Oregon." (citing *Or. Clinic, PC*, 75 F.4th at 1068)).

costs" that "reduce the insurer's applicable limit of liability on the insurer's indemnity

obligation":

> (7)(a)  There is a rebuttable presumption that the costs of preliminary assessments, remedial investigations, risk assessments or other necessary investigation, as those terms are defined by rule by the [ODEQ] . . . , are defense costs payable by the insurer, subject to the provisions of the applicable general liability insurance policy or policies.

> (b)  There is a rebuttable presumption that payment of the costs of removal actions or feasibility studies, as those terms are defined by rule by the [ODEQ] . . . , are indemnity costs and reduce the insurer's applicable limit of liability on the insurer's indemnity obligations, subject to the provisions of the applicable general liability insurance policy or policies.

OR. REV. STAT. § 465.480(7)(a)-(b); *see also Siltronic*, 176 F. Supp. 3d at 1037 ("Oregon law

establishes . . . rebuttable presumptions for categorizing environmental expenditures by

insurers[.]").

## B.    Defense Costs

Oregon statutes and rules define the terms to which ORS § 465.480(7)'s rebuttable

presumptions apply. With respect to "defense costs," OAR 340-122-0115(42) and (49) and OAR

340-122-0080(1) and (2) define "preliminary assessment," "risk assessment," and "remedial

investigation," respectively. *Siltronic*, 176 F. Supp. 3d at 1038 (simplified).

OAR 340-122-0115(42) defines "[p]reliminary assessment" as "an investigation

conducted in accordance with OAR 340-122-0072 for the purpose of determining whether

additional investigation, removal, remedial action, or related engineering or institutional controls

are needed to assure protection of public health, safety and welfare, and the environment." OR.

ADMIN. R. 340-122-0115(42). OAR 340-122-0115(49), on the other hand, defines "[r]isk

assessment" as the "process used to determine the probability of an adverse effect due to the

presence of hazardous substances." OR. ADMIN. R. 340-122-0115(49). Such an "assessment

includes identification of the hazardous substances present in the environmental media;

PAGE 23 – FINDINGS AND RECOMMENDATION

assessment of exposure and exposure pathways; assessment of the toxicity of the hazardous substances; characterization of human health risks; and characterization of the impacts or risks to the environment." *Id.*

Finally, OAR 340-122-0080(1) and (2) define "remedial investigation" as a post-preliminary assessment process "to develop information to determine the need for remedial action," which "may include, but is not limited to, characterization of hazardous substances, characterization of the facility, performance of baseline human health and ecological risk assessments, and collection and evaluation of information relevant to the identification of hot spots of contamination." OR. ADMIN. R. 340-122-0080(1)-(2); *see also Siltronic*, 176 F. Supp. 3d at 1038 (same).

### C.    Indemnity Costs

With respect to "indemnity costs," OAR 340-122-0115(45), ORS § 465.200(23) and (25) (i.e., renumbered as ORS § 465.200(15) and (17) in the version of the statute that became operative as of January 1, 2024), and OAR 340-122-0085(1) and (2) set forth the relevant definitions. *See Siltronic*, 176 F. Supp. 3d at 1038 (addressing former ORS § 465.200(23) and (25) and proceeding on the assumption that a "remedial action [may be] necessary" under OAR 340-122-0085(1)).

OAR 340-122-0115(45) provides that "'[r]emedial action' and '[r]emoval' have the meanings set forth in ORS [§] 465.200[(15) and (17)], respectively, and, for purposes of these rules, may include investigations, treatment, excavation and offsite disposal, engineering controls, institutional controls, [or] any combination thereof." OR. ADMIN. R. 340-122-0115(45).

PAGE 24 – FINDINGS AND RECOMMENDATION

ORS § 465.200(15) and (17) set forth the following definitions of "[r]emedial action" and

"[r]emoval":

(15)(a) "Remedial action" means those actions consistent with a permanent remedial action taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of a hazardous substance so that it does not migrate to cause substantial danger to present or future public health, safety, welfare or the environment.

(b)     "Remedial action" includes, but is not limited to:

(A)     Such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, on-site treatment or incineration, provision of alternative drinking and household water supplies, and any monitoring reasonably required to assure that the actions protect the public health, safety, welfare and the environment.

(B)     Offsite transport and offsite storage, treatment, destruction or secure disposition of hazardous substances and associated, contaminated materials.

(C)     Such actions as may be necessary to monitor, assess, evaluate or investigate a release or threat of release.

. . . .

(17)     "Removal" means the cleanup or removal of a released hazardous substance from the environment, such actions as may be necessary taken in the event of the threat of release of a hazardous substance into the environment, such actions as may be necessary to monitor, assess and evaluate the release or threat of release of a hazardous substance, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize or mitigate damage to the public health, safety, welfare or to the environment, that may otherwise result from a release or threat of release. "Removal" also includes but is not limited to security fencing or other measures to limit access, provision of alternative

PAGE 25 – FINDINGS AND RECOMMENDATION

> drinking and household water supplies, temporary evacuation and housing of threatened individuals and action taken under ORS [§] 465.260.

OR. REV. STAT. § 465.200(15), (17); *see also Siltronic*, 176 F. Supp. 3d at 1038 ("Although not expressly referenced in the statute, removal also necessarily includes a 'remedial action[.]'") (simplified).

Finally, OAR 340-122-0085(1) and (2) define a "feasibility study" as contingent on the necessity of a "remedial action" and involving the development of a range of acceptable alternative actions:

> (1)    If, based upon the remedial investigation, the results of a removal, or other information, [ODEQ's] Director determines that remedial action might be necessary to protect public health, safety or welfare or the environment, [ODEQ's] Director may perform or require to be performed a feasibility study to develop information for selection or approval of a remedial action.
>
> (2)    A feasibility study shall develop and evaluate a range of remedial action alternatives acceptable to the [ODEQ], including any or all of the following:
>
>> (a)    No action;
>>
>> (b)    Remedial action utilizing engineering and/or institutional controls;
>>
>> (c)    Remedial action utilizing treatment;
>>
>> (d)    Remedial action utilizing excavation and transportation to an offsite disposal facility; and
>>
>> (e)    Any combination of the above, as appropriate.

OR. ADMIN. R. 340-122-0085(1)-(2); *see also Siltronic*, 176 F. Supp. 3d at 1038 ("If a remedial action is necessary, a 'feasibility study' is then undertaken to 'develop and evaluate a range of remedial action alternatives acceptable to [ODEQ].'" (quoting OR. ADMIN. R. 340-122-0085(2))).

///

///

PAGE 26 – FINDINGS AND RECOMMENDATION

## II.    ANALYSIS

As the parties agree, General presents three questions in its motion for judgment on the pleadings. (Pl.'s Mot. at 4; Def.'s Opp'n at 6.) The parties frame these questions as (1) whether it is proper to characterize "certain environmental response costs" for which General reimbursed PENCO as "defense costs" or "indemnity costs," (2) whether General exhausted the Policy's aggregate limits of liability, and (3) if General exhausted these limits, whether it owes "any further obligation" to PENCO for environmental claims subject thereto. (Pl.'s Mot. at 4; Def.'s Opp'n at 6.)

The parties disagree about whether these questions (and the first question, in particular) are purely legal ones and appropriate for the Court to resolve at this stage and based only on their pleadings, attached exhibits, and incorporated documents. (*See* Pl.'s Mot. at 4, 12-14, arguing that the "answers [to] these questions are established by the written documents" that General attached to its complaint and PENCO "incorporated by reference" in support of its counterclaims; Def.'s Opp'n at 4 n.1, 6-10, agreeing on the pleadings, attachments, and documents that are properly before the Court but arguing that the issues presented turn on an initial "fact-based inquiry" and analysis that General failed to undertake, thus rendering its Rule 12(c) motion "premature"; Pl.'s Reply at 3, responding to the "first issue (cost characterization)" and PENCO's primary "focus").

### A.    Cost Characterization

With respect to the "core" dispute of cost characterization (Def.'s Opp'n at 7; Pl.'s Reply at 4), General argues that "not all investigative work is presumptively payable as a defense cost under the OECAA"; rather, parties incur defense costs to "determine *whether* remedial action is necessary" and cover work that they "performed before" entering into a Consent Order with ODEQ, whereas parties incur indemnity costs "*after* it has been determined that remediation is

PAGE 27 – FINDINGS AND RECOMMENDATION

necessary to determine the type or scope of the remedial action to be performed." (Pl.'s Mot. at 18.)

PENCO disputes General's distinction, arguing that there is no bright-line rule for determining, as a matter of law, whether "certain environmental costs should be characterized as 'defense' costs or 'indemnity' costs." (Def.'s Opp'n at 7.) PENCO adds that the "governing inquiry" under ORS § 465.480(7) is "fact-based" and centers on the "purpose of the work performed." (*Id.* at 7-8.)

In terms of case law, General argues that the circumstances here are similar to those before the district court in *Siltronic*, 176 F. Supp. 3d at 1045-46, a case from this district. (Pl.'s Mot. at 20-22.) Relatedly, PENCO directs the Court's attention to the "*Endicott*" cost "approach" upon which *Siltronic* relied. (Def.'s Opp'n at 9, citing *Siltronic*, 176 F. Supp. 3d at 1038, which adopted *Endicott Johnson Corp. v. Liberty Mut. Ins. Co.*, 928 F. Supp. 176, 184 & n.2 (N.D.N.Y. 1996).)

*Siltronic* was a declaratory judgment and breach of contract action that concerned the plaintiff insured's "environmental claims arising out of the Portland Harbor Superfund Site[.]" 176 F. Supp. 3d at 1036. The primary insurer and defendant issued seven annual comprehensive general liability policies to the plaintiff between 1978 and 1986. *Id.* More than two decades later, the plaintiff incurred millions of dollars in costs "pursuant to Orders and Agreements" that the ODEQ and EPA issued. *Id.* The primary insurer paid roughly $7.7 million for the plaintiff's "defense costs on various environmental claims" and before determining that it exhausted six of the seven policies' $6 million in indemnity limits. *Id.* The co-defendant umbrella insurer then agreed to cover "defense costs" but reserved its right to dispute the primary insurer's exhaustion claim. *Id.*

PAGE 28 – FINDINGS AND RECOMMENDATION

At summary judgment, the primary insurer moved for a court order that (1) the plaintiff's payment of its share of a Natural Resource Damage Assessment ("NDRA") "should be treated as indemnity costs," (2) the primary insurer's payment of the plaintiff's share of a "settlement" between a local group and ODEQ "should be treated as indemnity costs," and (3) costs that the plaintiff "agreed to pay under a settlement agreement with the [EPA] for remedial design activities [we]re properly characterized as indemnity costs[.]" *Id.* at 1036-37. In support, the primary insurer argued that in concluding that it exhausted six of the plaintiff's seven policies' limits of liability, it followed ORS § 465.480(7) and categorized payments that it made on the plaintiff's behalf as "either defense or indemnity costs." *Id.* at 1038. The umbrella insurer disputed this assertion and maintained that the primary insurer "mischaracterized certain payments to [the plaintiff] as indemnity costs, causing a premature exhaustion of its coverage limits." *Id.*

In evaluating the primary insurer's motion, the district court turned first to ORS § 465.480(7)'s rebuttable presumptions and the definitions of "preliminary assessment," "remedial investigation," and "risk assessment" (i.e., "defense costs" under paragraph (a)) and "removal" and "feasibility study" (i.e., "indemnity costs" under paragraph (b)). *Id.* at 1037-38. The district court also noted that it previously "adopted the approach set forth in *Endicott*" for "resolving whether a cost should be characterized as defense or indemnity." *Id.* at 1038. As the district court explained, "[t]he *Endicott* approach determines the proper category of costs according to the substance of the underlying work by governmental agencies, attorneys, and environmental consultant[s], and not by the posture of the party performing the work." *Id.* (citing

PAGE 29 – FINDINGS AND RECOMMENDATION

*Endicott*, 928 F. Supp. at 184 & n.2).[14] The district court later expanded on its application of the

*Endicott* approach:

> To the extent that an expense is primarily attributable to remedial investigations—which address the sources and extent of the contamination, whether environmental damage can be mitigated by controlling the sources, or whether additional action is necessary because of migration of contaminants from the site—the expense will be treated as a defense cost. To the extent an expense is primarily attributable to feasibility studies—which comprise plans for selecting and implementing the remediation alternative for the site—the expense will be treated as damages to be indemnified. Finally, to the extent the [c]ourt cannot determine based on written submissions whether an expense is attributable to either [remedial investigation] or [feasibility studies], the [c]ourt will have broad discretion to allocate the expense in an equitable manner.

*Id.* at 1039 (quoting *Endicott*, 928 F. Supp. at 184).

With all of this in mind, the district court turned to the primary insurer's payment of the

plaintiff's share of the settlement between a local group and ODEQ. *Id.* at 1041. The district

court rejected the primary insurer's argument that "this payment [was] presumptively an

indemnity cost because it generally resolve[d O]DEQ's claims against the [group and occurred]

in connection with the Consent Judgment." *Id.* The district court rejected this argument because

it was "premised on who receive[d] the funds which . . . [was] irrelevant" to the inquiry into the

"substance of the work for which the payment was made." *Id.* After doing so, the district court

held that the "record [was] clear" that the primary insurer's payment was a "defense cost" within

the meaning of ORS § 465.480(7)(a) because (1) the payment "reimbursed remedial

investigation costs [that ODEQ] incurred," (2) such a "characterization [was] consistent with the

*Endicott* approach," (3) the payment "settled [the plaintiff's] liability to the [local group] for

[O]DEQ's investigation costs to identify" potentially responsible parties ("PRP"), and

---

[14] Under the *Endicott* approach, "[i]t does not matter . . . who incurred the expense initially (thus EPA oversight costs are included) or whether the expense was mandated or not." 928 F. Supp. at 184 & n.2; (*but cf.* Pl.'s Reply at 6, referencing mandates under *Endicott*).

PAGE 30 – FINDINGS AND RECOMMENDATION

(4) although the "payment resolve[d] a party's liability to an adversary, the issue presented when applying Oregon's [rebuttable] statutory presumptions is the nature of the liability being settled." *Id.*

With respect to the NRDA, the district court observed that under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), "a party responsible for a release of hazardous substances is also liable for 'damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of [evaluating] such injury, destruction, or loss resulting from such a release" and "assessed through a[n] NRDA" under the Department of Interior's rules. *Id.* at 1041 (first quoting 42 U.S.C. § 9607(a)(4)(B); and then citing 43 C.F.R. §§ 11.10-.93). The district court added that the primary insurer argued that it was entitled to "refuse[] to reimburse" the plaintiff for its "share of the funding for Phase 2 of the NRDA," because it "already exhausted its indemnity obligation under its policies." *Id.* at 1042. Phase 2 involved the "implementation of a settlement-oriented assessment," followed Phase 1 (i.e., "time-critical work" and the "development of an Injury Assessment Plan"), and preceded Phase 3 (i.e., "completion of the NRDA") and Phase 4 (i.e., "recovery of damages from non-settling PRPs"). *Id.* at 1041.

The district court explained that contrary to the primary insurer's argument, the payment was a "Phase 1 make-up payment" and that "[a]lthough it [was] impossible to parse exactly which Phase 1 activities [the plaintiff's] payment covered, Phase 1 activities as a whole [w]ere easily identifiable as defense costs under Oregon's statutory presumption" and the "*Endicott* approach." *Id.* at 1042-43. Like the ODEQ costs described above, the district court found that the "most functional approach [was] to classify each of the four phases of the NRDA based on whether the substance of the work [was] primarily defense or indemnity" and emphasized on

PAGE 31 – FINDINGS AND RECOMMENDATION

multiple occasions that certain activities "identifie[d]" and "determine[d] the extent of the damage":

> Based on the *Endicott* approach, Phase 1 funding should be classified as defense costs. Similar to classifying [O]DEQ oversight costs, the most functional approach is to classify each of the four phases of the NRDA based on whether the substance of the work is primarily defense or indemnity. The Injury Assessment identifies the extent of the damage and involves activities similar to "preliminary assessments, remedial investigation, risk assessments or other necessary investigation" which are defined as defense costs in ORS [§] 465.480(7)(a). The other actions (species studies, public outreach, document development, literature review, and framing[, i.e.,] Phase 2) involve early investigation and, hence, constitute defense costs.

> Instead of characterizing the costs by each separate phase under the *Endicott* approach, [the primary insurer] urges the court to analyze the posture of the NRDA process as a whole[, and the fact that the plaintiff's] payment to fund Phase 1 of the NRDA reimbursed one of its adversaries, namely the EPA. . . .

> Prior decisions in other Portland Harbor Superfund Site litigation have found that efforts to reduce an insured's ultimate indemnity costs are part of the duty to defend. . . .

> . . . .

> [Furthermore, the] focus of Phase 1 determines the extent of damage to the natural resources. That information may be used in Phase 2 to estimate liability. The cooperate assessment process of Phase 1 allows [the plaintiff] and other polluters to potentially limit their overall liability by facilitating settlement during Phase 2 of the Portland Harbor NRDA. "Phase 2 is an intermediate step [that is] not required by the federal regulations[ and] use[s] existing information[,] reasoned estimates[,] and conservative, simplifying assumptions to the extent practicable; and guidance in the federal regulations, with the goal of arriving at realistic early settlements with cooperating [potentially liable persons or PRPs]." . . . In addition to giving PRPs an arena for early settlement of their potential liability for natural resources damage, . . . participation in the NRDA also gives PRPs input into limiting the costs of assessing those damages.

> . . . .

> In contrast to this characterization of [the plaintiff's] payments for participation in the NRDA process as akin to a joint defense fund aimed at reducing both its assessment costs and ultimate liability, [the primary insurer] argues the payments instead serve only to satisfy its indemnity obligation. At the conclusion of the NRDA process, [an adversary, the Natural Resource Trustees ("NRT"),] will recover damages for injury to the natural resources, costs of

emergency restoration efforts, and costs for performing the NRDA. 43 C.F.R.
§ 11.15. It points out that payments made pursuant to Phase 1 will be credited
against that ultimate liability. As stated in the [Funding Participation Agreement
("FPA")] for Phase 1, the "[t]rustees agree to credit costs paid under the Interim
Agreement and [FPA] against the liability, if any, of the [p]articipant for natural
resource damage assessment costs or natural resource damages." . . . Similarly,
the FPA for Phase 2 [provides that] "[t]he [t]rustees consider such costs as
reasonable damage assessment costs and agree that the payment of such costs will
be credited against a Phase 2 [p]articipant's natural resource liability." . . . Even
though payments for Phases 1 and 2 (including the Phase 1 make-up payment)
will be credited against [the plaintiff's] ultimate liability for natural resource
damage, the fact remains that [the plaintiff] may be able to reduce that liability by
paying to participate in the NRDA process. Thus, the Phase 1 make-up payment is
properly characterized pursuant to ORS 465.480(7) as defense costs. . . .

*Id.* at 1043-45 (simplified).

Having resolved these issues, the district court proceeded to the third and final category

of payments in dispute: "Costs that [the plaintiff] agreed to pay under a settlement agreement

with the [EPA] . . . for remedial design activities[.]" *Id.* at 1037, 1045. These costs related to a

Cost Sharing Agreement ("CSA") that the plaintiff entered into with a third party regarding their

"commingled contamination" and costs that they incurred in complying with an Administrative

Settlement Agreement ("ASA") and "Order on Consent for Removal Action" that they

"negotiated with the EPA." *Id.* at 1045. The ASA required the plaintiff and third party to

"perform 'a response action [site] investigation and design activities'" described in an attached

SOW. *Id.*

The district court observed at the outset that the umbrella insurer disputed only whether

costs associated with the SOW's "first part (investigation)" was a "'remedial investigation' and

properly characterized as a defense cost." *Id.* at 1046. Rejecting the umbrella insurer's

suggestion that "all projects that involve investigation are defense costs," the district court found

that the relevant "question [was] what types of investigations fall into [the indemnity] category"

because "only 'remedial investigations' and 'other necessary investigations' are presumed to be

PAGE 33 – FINDINGS AND RECOMMENDATION

defense costs" and "[a]lthough not expressly referenced in ORS [§] 465.480(7)," OAR 340-122-0115(45) "provide[s] that removal and remedial action (indemnity costs) also '*may include investigations*, treatment, excavation and offsite disposal, engineering controls, institutional controls, any combination thereof.'" *Id.* (quoting OR. ADMIN. R. 340-122-0115(45)). After making these findings, the district court held that the payments were indemnity costs under ORS § 465.480(7)(b):

> As explained by the regulations, a "remedial investigation" is a process undertaken after the preliminary assessment "*to develop the need for remedial action*." [OR. ADMIN. R.] 340-122-0080(1)-(2) (emphasis added). The ASA and SOW refer to several site investigations revealing that the river sediments were sufficiently contaminated with both coal tar (for which [the third party] is a PRP) and [trichloroethylene] (for which [the plaintiff] is a PRP) to require a "removal response action." . . . Thus, . . . when the parties entered the ASA it was clear that contaminants in the [relevant] [s]ediment [s]ite required cleanup, whether through remediation or removal. Accordingly, the investigation and data collection in the first stage of the SOW was not necessary "to develop the need for remedial action."

> The preliminary assessment and remedial investigation for the [site] . . . was being completed outside the SOW. According to the sequence of work, the EPA and [O]DEQ would complete source control measures of the groundwater and upland remediation before the final in-river sediment remedy. . . . When performance of the SOW began, the feasibility study for Phase 1 (groundwater and transition zone water impacted by contaminants) had been reviewed by [O]DEQ and the supporting remedial investigation was still under review. . . . Likewise, [O]DEQ was reviewing the remedial investigation and risk assessment report for Phase 2, the upland remedial action, and the feasibility study was in the preliminary planning phase. . . . The remedial investigations and feasibility studies for Phases 1 and 2 did not include the in-river sediment cleanup covered by the SOW.

> Instead, the [site] . . . would rely on the "harbor-wide risk and [Feasibility Study] information as it becomes available to develop a [site] design that [was] consistent and fully integrated with the Harbor-wide remedy." . . . The "Portland Harbor Remedial Investigation . . . [was] almost complete and the Feasibility Study . . . phase [was] beginning." . . . This was partly because the [O]DEQ was the lead agency on Phases 1 and 2 while the EPA provided oversight of sediment construction and riverbank remediation work (top of bank riverward) and intended for the "riverbank and sediment work [to] include one comprehensive [Endangered Species Act] evaluation." . . .

PAGE 34 – FINDINGS AND RECOMMENDATION

> Contrary to [the umbrella insurer's] contention, the remedial investigation for the [site] . . . was either nearly or completely finished as part of the Portland Harbor Remedial Investigation. Most importantly, [however,] it was performed outside the SOW. Accordingly, the SOW does not include a "remedial investigation" to determine the need for a remedy. Instead, the work to fill in data gaps and prepare an [Engineering Evaluation/Cost Analysis under the second part of the SOW] was necessary to design the remedy for the . . . site and [thus] properly characterized under ORS [§] 465.480(7) as indemnity costs.

*Id.* at 1046-47.

### B.    Disposition

The Court recommends that the district judge deny General's motion for judgment on the pleadings.

In evaluating a motion for judgment on the pleadings, "[a]ll allegations of fact by the party opposing the motion are accepted as true, and are construed in the light most favorable to that party." *Unite Here Loc. 30 v. Sycuan Band of the Kumeyaay Nation*, 35 F.4th 695, 700 (9th Cir. 2022) (citing *Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989)). Applying that standard and based on the agreed-upon record before it, the Court concludes that genuine issues of material fact preclude granting General's Rule 12(c) motion. *Cf. id.* ("A district court must grant a motion for judgment on the pleadings when there is no issue of material fact, and the moving party is entitled to judgment as a matter of law." (citing *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009))).

Seeking to persuade the Court otherwise, General relies almost exclusively on the *Siltronic* district court's evaluation of costs related to the SOW's "first part (investigation)" and rejection of the umbrella insurer's argument that the work was a "remedial investigation" and "defense costs" under ORS § 465.480(7)(a). (*See* Pl.'s Mot. at 18-22, relying on the ASA and Order on Consent for Removal Action's "SOW" and district court's holding regarding the "'final

PAGE 35 – FINDINGS AND RECOMMENDATION

[sediment] remedial investigation' costs," and citing *Siltronic*, 176 F. Supp. 3d at 1045-47); *cf. id.* at 4-17, 23-27, setting forth the background, legal standards, and basing General's remaining arguments in whole or in part on its position on indemnity costs/exhaustion). General argues that this part of *Siltronic*'s analysis involved "indistinguishable" facts about the "single disputed legal question that will resolve this case." (Pl.'s Reply at 8-9, citing *Siltronic*, 176 F. Supp. 3d at 1045-47.) Not so.

General fails adequately to address or account for (1) aspects of the *Siltronic* district court's cost characterization approach, on which both parties rely, (2) related legal and factual issues that PENCO raises in its opposition, and (3) deficiencies, conflicts, and ambiguities that are apparent on the face of the undeveloped record currently before the Court.

*Siltronic*'s description of the *Endicott* approach is an appropriate starting point here. Under this approach, courts "determine[] the proper category of costs according to the substance of the underlying work by governmental agencies, attorneys, and environmental consultant[s], and not by the posture of the party performing the work." *Siltronic*, 176 F. Supp. 3d at 1038 (citing *Endicott*, 928 F. Supp. at 184 & n.2). Under this approach, courts evaluate the category (i.e., presumptive defense or indemnity costs) to which the work "expense is primarily attributable." *Id.* at 1039 (quoting *Endicott*, 928 F. Supp. at 184). Further, under this approach, an insurer's assigned labels (especially conclusory ones) are meaningless. *See Siltronic Corp. v. Employers Ins. Co. of Wausau*, No. 3:11-cv-01493-YY, 2016 WL 11187030, at *6 (D. Or. Nov. 14, 2016) ("[T]he proper category of costs must be determined according to the substance of the underlying work performed by Maul Foster, not the label assigned by the insurer." (citing *Endicott*, 928 F. Supp. at 184 & n.2)), *findings and recommendation adopted*, 2017 WL 1305265, at *1 (D. Or. Feb. 17, 2017).

PAGE 36 – FINDINGS AND RECOMMENDATION

The district courts' November 2016 decision in *Siltronic* and *Northwest Pipe Co. v. RLI Insurance Co.*, No. 3:09-cv-01126-BR, 2014 WL 1406595 (D. Or. Apr. 10, 2014), are illustrative of these points.

In the November 2016 *Siltronic* decision, the district court confronted a comparable procedural situation in ruling on a motion to compel the primary insurer to "reimburse [the plaintiff] for fees incurred for work performed by its . . . counsel's environmental consulting firm, Maul Foster[.]" 2016 WL 11187030, at *6. Taking a "closer look at" and highlighting aspects of the invoices at issue, the district court found that cost characterization was "more complicated" than the plaintiff "let[] on" and a "factual determination . . . beyond the scope of [its] motion," and that the umbrella insurer's "classification of the[] costs ha[d] no bearing on the legal nature of the fees" because cost characterization does not turn on the "label" that an insurer "assign[s]" to invoices. *Id.* (citing *Endicott*, 928 F. Supp. at 184 n.2). Ultimately, the district court held that an "[a]ccurate characterization of environmental consulting fees according to *Endicott* and the Oregon statutory presumptions [would] require the parties to submit evidence detailing the substance of the work for which [the plaintiff] paid and [sought] reimbursement." *Id.*

Similarly, in *Northwest Pipe Co.*, the district court held that genuine issues of material fact related to costs precluded summary judgment in an insurer's favor. 2014 WL 1406595, at *8-9. In so holding, the district court explained that the record "evidence" was "insufficient" to "allow the court to grant [the insurer's] motion" and when "presented with a similar issue and asked to determine whether certain costs related to [an] insured's environmental claim were properly categorized as defense or indemnity costs," one of the *Siltronic* decisions "relied on detailed evidence and testimony provided by the parties as to the specific work for which the disputed invoices issued and the way that work related to the types of costs outlined in [ORS]

PAGE 37 – FINDINGS AND RECOMMENDATION

§ 465.480(7)(a) and (b)." *Id.* at *6, *8 (referencing "*Siltronic II*" and citing *Siltronic Corp. v. Emps. Ins. Co. of Wausau*, No. 3:11-cv-01483-ST, 2014 WL 901161, at *3, *7 (D. Or. Mar. 7, 2014)). Recognizing that the insurer's consultant's chart summarized payments that purportedly "count[ed] against [the insurer's] indemnity limits" but failed to explain the "method that he used," the district court emphasized that the insurer failed to "provide[] any . . . evidence" comparable to "*Siltronic II*" or "explain[] the specific work that was performed . . . or the bases for [the insurer's] conclusions that certain tasks were [appropriately] treated as defense costs or indemnity payments for purposes of analyzing the exhaustion issue." *Id.* at *8. Consequently, the district court held that "on th[at] record," there were "genuine disputes of material fact and unresolved questions of insurance law preclud[ing] summary judgment" in the insurer's favor. *Id.* at *9.

Contrary to these cases and the approach upon which it relies, General advances arguments that necessarily depend on conclusory labels that its consultant assigned to ENW's invoices in spreadsheets, which General attached to its complaint and now introduces via a Rule 12(c) motion. (*See* Compl. Ex. C at 4-5.) General's spreadsheets are problematic for several reasons and confirm that the district judge should deny General's motion for judgment on the pleadings.

In describing the facts, General notes that it "characterized a total of $128,088.95 of charges reflected on [ENW's] . . . invoices dated between June 2023 and February 2025 as remediation costs payable as part of a duty to indemnify." (Pl.'s Mot. at 9, citing Compl. Ex. C at 4-5.) General adds that after issuing "payment for $75,000 to reimburse PENCO for indemnity costs (in addition to $81,580.11 to reimburse PENCO for defense costs), General notified

PENCO that the Policy had exhausted and would provide no further coverage." (*Id.*, citing Compl. Ex. C at 2.)

However, General's spreadsheets demonstrate that: (1) most of the listed invoices omit any start and end dates and description of the work performed and include nothing more than the invoice's date, number, billed total, and a conclusory column in which General assigned labels like "non-questioned remedial" or "non-questioned investigation," (2) $128,088.95 is the sum total of the invoices dated May 18, 2023 (i.e., not June 8, 2023, the next invoice date or "June 2023," as General suggested, and four days before PENCO and ODEQ entered into the Consent Order on May 22, 2023) to January 30, 2025, (3) General characterized the $8,731.75 final invoice dated February 27, 2025 (i.e., nearly two years post-Consent Order and before General told PENCO that it exhausted the Policy's indemnity limits and issued a final indemnity check of $5,586.09), as a defense cost because it concerned "[a]ctivities to distinguish PCB contamination in Cathedral Park from the release of PCBs in the N[orth] Bradford St. right-of-way" and "meeting with ODEQ," and (4) the June 2024 spreadsheet lists $80,473.61 in assigned defense cost invoices, including an April 26, 2024 invoice that General paid when it issued PENCO's two July 2024 defense costs checks totaling $72,848.36.[15] (Compl. Ex. C at 2, 4-5; Pl.'s Mot. at 9) (simplified).

---

[15] The sum of General's tables' indemnity and defense costs columns is $128,088.95 (i.e., $69,413.91 plus $58,675.04) and $89,205.36 (i.e., $80,473.61 plus $8,731.75), respectively. (*See* Compl. Ex. C at 4-5.) General states that (1) it paid "$75,000" to reimburse PENCO for the "total of $128,088.95 in charges" that General "characterized" as indemnity costs, and (2) after issuing PENCO's final defense costs check of "$8,731.75" (i.e., the total invoiced on February 27, 2025), General paid a total of "$81,580.11" (i.e., "$72,848.36" in checks "dated July 3, 2024," plus "$8,731.75" based on PENCO's "cost submissions of April 2025") to reimburse PENCO for the charges that General characterized as defense costs. (Pl.'s Mot. at 9; Compl. Ex. C at 2, 4-5.) Thus, General's defense costs total necessarily includes the April 26, 2024 and February 27, 2025 invoices that post-date the Consent Order and excludes one of the invoices from 2021 (i.e., the November 23, 2021 invoice for "$7,625.25" but not the December 29, 2021

PAGE 39 – FINDINGS AND RECOMMENDATION

General's spreadsheets are insufficient under the cost characterization approach and case law upon which it relies. Most of the entries in General's spreadsheets fail to address, among other things, the work performed, when PENCO/ENW started and completed work, the extent to which totals are attributable to particular tasks or portions of relevant time ranges, the import of and whether and to what extent costs were attributable to work comparable to General's description of the February 27, 2025 invoice or work that PENCO voluntarily commenced before (and continued to perform after) it entered into the Consent Order with ODEQ, and how such considerations align with the method that General used in characterizing the disputed invoice costs.

These issues are significant and undermine General's motion, which it frames as turning on whether ENW's invoices predate or postdate PENCO and ODEQ's May 22, 2023 Consent Order:

> The investigation costs that would be presumptive defense costs under the OECAA, those investigation costs necessary to determine whether remedial action would be required at the Site, were performed before PENCO and [O]DEQ entered the . . . [Consent] Order. . . .
>
> . . . .
>
> . . . The investigations necessary to determine whether remedial action was necessary at the Site were performed by PENCO (the focused site investigation) and other parties before PENCO and [O]DEQ entered the . . . [Consent] Order. . . . These investigations were performed outside of the . . . [Consent] Order. Costs incurred by PENCO performing investigations required by the . . . [Consent] Order, like the final remedial investigation costs at issue in *Siltronic*, are properly characterized as indemnity under the OECAA.
>
> Because costs incurred by PENCO to perform the investigation required by the . . . [Consent] Order are properly characterized as indemnity costs, these costs apply to and erode the Policy's limits of liability. . . .

---

invoice for "$543.75"). (*Compare* Compl. Ex. C at 2, 4-5, *and* Pl.'s Mot. at 9, citing Compl. Ex. C at 2, 4-5.)

PAGE 40 – FINDINGS AND RECOMMENDATION

(Pl.'s Mot. at 18, 22.)

> The core disagreement in this case is whether investigative costs that PENCO incurred and General reimbursed for investigative work required by the . . . [Consent] Order should be characterized as defense or indemnity under the [OECAA.] . . . [O]DEQ determined this remedial action was necessary based on data collected by PENCO and other parties as part of investigations of soil contamination in the area *before* PENCO and [O]DEQ entered the . . . [Consent] Order. . . . As of the date the . . . [Consent] Order was entered [i.e., May 22, 2023], any "remedial investigation" necessary to "develop the need for remedial action," the type of investigative cost that is presumed to be a defense cost under ORS [§] 465.480(7)(a), had already been completed.

(Pl.'s Reply at 4; *see also* Def.'s Answer ¶ 52; Pl.'s Answer ¶ 52, "On June 28, 2024, [General's representative] . . . sent an email to [PENCO's counsel] advising that [its] consultant had reviewed [ENW's] invoices . . . and unilaterally categorized all costs incurred prior to [ODEQ's] issuance of the [Consent] Order as 'defense,' and all costs incurred after [ODEQ's] issuance of the [Consent] Order as 'indemnity,' further asserting that PENCO had only $5,58[6].09 in indemnity limits remaining under the Policy"; Compl. Ex. C at 2, correcting the total) (simplified).

These facts and authorities confirm that General's Rule 12(c) motion is premature. "[F]ederal courts have followed a fairly restrictive standard in ruling on motions for judgment on the pleadings." 5C Charles Alan Wright et al., *Federal Practice and Procedure* § 1368 (3d ed. Apr. 2026 update) (simplified). Rule 12(c) "motion[s] may be helpful in disposing of cases in which there is no substantive dispute that warrants the litigants and the court proceeding further." *Id.* At the same time, however, "hasty or imprudent use of this summary procedure . . . violates the policy in favor of ensuring to each litigant a full and fair hearing on the merits of his or her claim or defense." *Id.* That is why federal courts have been "unwilling to grant a motion under . . . [Rule] 12(c) unless the movant clearly establishes that no material issue of fact remains to be resolved and that he is entitled to judgment as a matter of law." *Id.* General fails clearly to

PAGE 41 – FINDINGS AND RECOMMENDATION

establish that no genuine issues of material fact exist with respect to whether PENCO's environmental response costs were defense or indemnity costs. Thus, General is not entitled to judgment as a matter of law.[16]

## CONCLUSION

For the reasons stated, the Court recommends that the district judge DENY General's motion for judgment on the pleadings (ECF No. 23).

## SCHEDULING ORDER

The Court will refer its Findings and Recommendation to a district judge. Objections, if any, are due within fourteen (14) days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within fourteen (14) days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 24th day of April, 2026.

Stacie F. Beckerman

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge

---

[16] For the same reasons, General also fails clearly to establish that no genuine issues of material fact exist with respect to whether it exhausted the Policy's limits and owes "any further obligation" to PENCO for environmental claims subject to such limits. (Pl.'s Mot. at 4; Def.'s Opp'n at 6.)

PAGE 42 – FINDINGS AND RECOMMENDATION